Receipt # 066293

ORIGINAL

FILED
MAR 15 2007
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES
COURT OF FEDERAL CLAIMS

**PENNSAUKEN SENIOR TOWERS URBAN RENEWAL ASSOCIATES, LLC**
4300 Haddonfield Road, Suite 111
Pennsauken, NJ 08109

and

**HOUSING AUTHORITY OF THE TOWNSHIP OF PENNSAUKEN**
2400 Bethel Avenue
Pennsauken, NJ 08109

Plaintiffs,

vs.

**THE UNITED STATES OF AMERICA,**

Defendant.

CASE NO. **07-174 C**

**COMPLAINT**

## I. Preliminary Statement

1. Plaintiffs Pennsauken Senior Tower Urban Renewal Associates, LLC, a New Jersey Limited Liability Company ("Renewal Associates") and the Housing Authority of the Township of Pennsauken, NJ, a public entity of the State of New Jersey ("Housing Authority"), bring this action for damages resulting from the failure of the United States of America, acting through the Department of Housing and Urban Development ("HUD"), to provide for automatic annual rent increases or appropriate such increases in the Contract anniversary years 2001 through 2006 for the Pennsauken Towers Apartments project. Under the Housing Assistance Payment Contract ("Pennsauken Towers HAP Contract") entered into between the Housing Authority and HUD, the Pennsauken Towers project is entitled to annual rent increases for the subject property more fully described herein. HUD has breached the Pennsauken Towers HAP Contract by its failure and subsequent refusal to grant the rent increases, mandated by the Pennsauken Towers

HAP Contract, resulting in damages to the Pennsauken Towers project in the amount of at least $706,400.

## II. Venue

2. This Court has subject matter jurisdiction pursuant to the provisions of the Tucker Act, 28 U.S.C. § 1491, as this claim is founded upon breaches of an express contract entered into between Housing Authority and HUD and in which Renewal Associates has an interest.

## III. Parties

3. Renewal Associates is a limited liability company duly organized and existing under the laws of the State of New Jersey and is the owner of a certain property known as the Pennsauken Towers Apartments which is located in Pennsauken Township, Camden County, New Jersey and consists of 100 one bedroom units and one bedroom manager's apartment.

4. Renewal Associates is the assignee of Pennsauken Housing Associates ("Housing Associates") of a Lease Agreement dated December 1, 1979 between the Housing Authority and Housing Associates wherein the Housing Authority leased the property for 30 years from Housing Associates. Housing Associates and its successors are obligated under the Lease to operate and maintain the property pursuant to the Pennsauken Towers HAP Contract and Housing Authority is obligated to assist in obtaining eligible tenants and to assign all income from the project, including that from the Pennsauken Towers HAP Contract, to Housing Associates and its successors. (See Lease Agreement between Housing Associates and Housing Authority attached as Exhibit A.)

5. HUD is an agency of the United States of America and at all times relevant to the allegations in this Complaint was acting as an agent of the United States of America. The actions of HUD are therefore imputed to the United States of America.

## IV. Statement of Operative Facts

### A. The Pennsauken Towers HAP Contract

6. As of November 1, 1980, Housing Authority entered into a HAP contract with HUD for Pennsauken Towers Apartments, designated the Pennsauken Towers Apartments Project, HUD project number OH 12-0003-002. (See Pennsauken Towers HAP Contract attached as Exhibit B.) Said Contract was authorized under the United States Housing Act of 1937, 42 U.S.C.1437, *et seq.*, specifically 42 U.S.C. 1437f ("Section 8"), and the Department of Housing and Urban Development Act, 42 U.S.C. 3531, *et seq.*

7. Under the terms of the Pennsauken Towers HAP Contract, HUD is to provide housing assistance payments to Pennsauken Towers for units in the Pennsauken Towers Apartments Project under lease by lower-income families.

8. The Pennsauken Towers HAP Contract sets forth the initial contract rent for each unit at $486 per unit per month for one bedroom units ("Initial Contract Rent"). Included within that Initial Contract Rent was an initial difference of 20% between that rent and fair market rent for comparable unassisted units.

9. Under Section 1.6(f)(1) of the Pennsauken Towers HAP Contract, the project owner is required to submit monthly requests to HUD for housing assistance payments.

10. Section 1.8(b) of the Pennsauken Towers HAP Contract, entitled Automatic Annual Adjustments, contains a mechanism whereby the Contract Rent due Pennsauken Towers is to be increased on an annual basis and provides in full as follows:

> (1) *Automatic Annual Adjustment Factors will be determined by the Government at least annually; interim revisions may be made as market conditions warrant. Such Factors and the basis for their determination will be published in the Federal Register. These published Factors will be reduced*

*appropriately by the Government where utilities are paid directly by the Families.*

(2) *On each anniversary date of the Contract, the Contract Rents shall be adjusted by applying the applicable Automatic Annual Adjustment Factor most recently published by the Government. Contract Rents may be adjusted upward or downward, as may be appropriate; however, in no case shall the adjusted Contract Rents be less than the Contract Rents on the effective date of the Contract.*

11. Since the Pennsauken Towers HAP Contract went into effect, HUD has published AAAFs for each year.

12. Section 1.8(d) of the Pennsauken Towers HAP Contract further provides:

(d) *Overall Limitation. Notwithstanding any other provisions of this Contract, adjustments as provided in this Section shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Government; provided that this limitation shall not be construed to prohibit differences in rents between assisted and comparable unassisted units to the extent that such differences may have existed with respect to the initial Contract Rents.*

13. Under the provisions of 42 U.S.C. § 1437f(c)(1), the housing assistance payments provided by HUD are designed to reimburse the project owner for the difference between the rent called for under the Pennsauken Towers HAP Contract for each unit ("Contract Rent") and the amount paid by each leasing family.

## B. The Amendments and the Directive

14. On September 28, 1994, Congress enacted amendments to the United States Housing Act of 1937 including amendments to 42 USCA §1437f(c)(2)(A), which limited adjustment of rents under HAP Contracts to situations where the owner demonstrates that the adjustment would not exceed comparable rents for unassisted units and required the deduction of

one percent from the automatic adjustment factor ("AAAF") for units occupied by the same family("Amendments").

15. After enactment of the Amendments, HUD issued Directive 95-12 ("Directive") to implement the Amendments.

16. If existing contract rents exceeded HUD published fair market rents for the area, in order to receive an adjustment of rent, the Directive required owners to submit comparability studies showing comparable rents at least five percent more than the existing rent. The Directive limited adjustments to the sum of comparable rent and the Initial Difference.

17. The Directive also provided for deduction of one percent from the AAAF for units occupied by the same families and provided that adjustments in rent would only take effect 60 days from the date of application for same.

18. Because of its implementation of the Amendments and the Directive, HUD breached the Pennsauken Towers HAP Contract.

**Count I**

**(Breach of Contract - Annual Rent Adjustment)**

19. Pennsauken Towers re-alleges the allegations contained in Paragraphs 1-18 of this Complaint as if fully rewritten herein.

20. Between 1980 and 1994 the Contract Rent for Pennsauken Towers Manor Apartments was increased pursuant to the provisions of Section 1.8(b) of the Pennsauken Towers HAP Contract from $486 to $854 for one bedroom units. There were no increases granted since then for the anniversary years 1995 through 2006.

21. Since the 1994 Contract Rent adjustment which established the Contract Rent recited in paragraph 20 above, the Government has published AAAFs each year.

22. Based upon the provisions of the Pennsauken Towers HAP Contract cited above, Pennsauken Towers was entitled to receive automatic Contract Rent adjustments through application of the AAAFs for the anniversary years 1995 through the date of the filing of this Complaint, which HUD, though requested, has failed to provide.

23. The failure by HUD to adjust the Contract Rents through application of the AAAFs on the Pennsauken Towers HAP Contract's anniversary dates has resulted in substantially lower housing assistance payments being made by HUD to Pennsauken Towers for the Pennsauken Towers Manor Apartments Project since HUD's first failure to adjust fully the Contract Rent on March 17, 1995 and to pay the appropriate Contract Rent on March17, 2001.

24. Despite Pennsauken Towers's compliance with the express provisions of the Pennsauken Towers HAP Contract, HUD continues to refuse to make retroactive rent adjustments for the anniversary years 2001 through the date of the filing of this Complaint.

25. By its actions, HUD has breached the express terms of the Pennsauken Towers HAP Contract in failing to pay fully the automatic annual adjustments in the Contract Rent for the anniversary years 2001 through the date of the filing of this Complaint.

26. As a result of HUD's breach of the Pennsauken Towers HAP Contract, Pennsauken Towers has been damaged in an amount not less than $709,400. Pennsauken Towers is therefore entitled to the monetary and other relief described hereinafter.

**Count II**

**(Breach of Contract - One Percent Reduction)**

27. Pennsauken Towers re-alleges the allegations contained in Paragraphs 1-26 of this Complaint as if fully rewritten herein.

28. HUD further breached the Pennsauken Towers HAP Contract by providing that it would reduce the AAAF by one percent for units occupied by the same tenant for the anniversary years 1995 through the date of filing of this Complaint.

**Count III**

**(Declaratory Relief – One Percent Reduction)**

29. Pennsauken Towers re-alleges the allegations contained in Paragraphs 1-28 of this Complaint as if rewritten herein.

30. The One Percent Reduction required by the Amendments and the Directive would result in a breach of the Pennsauken Towers HAP Contract, if applied, and Pennsauken Towers requests a declaration to that effect and an order prohibiting application of such One Percent Reduction.

**Count IV**

**(Breach of Contract – Failure to Automatically Adjust Rent from 1995-2000)**

31. Pennsauken Towers re-alleges the allegations contained in paragraphs 1-30 as if fully rewritten herein.

32. HUD further breached the Pennsauken Towers HAP Contract by failing to automatically adjust fully the Contract Rent from 1995 through 2000 anniversary years so that the 2000 Contract Rent for the application of the 2001 AAAF was lower than it should have been.

**Count V**

**(Breach of Contract - Overall Limitation-Initial Difference)**

33. Pennsauken Towers re-alleges the allegations contained in Paragraphs 1-32 of this Complaint as if fully rewritten herein.

34. HUD further breached the Pennsauken Towers HAP Contract by failing to make a proper determination of and allowance for "initial difference".

**Count VI**

**(Breach of Contract - Overall Limitation-Material Difference)**

35. Pennsauken Towers re-alleges the allegations contained in Paragraphs 1-34 of this Complaint as if fully rewritten herein.

36. HUD further breached the Pennsauken Towers HAP Contract by failing to make a proper determination of and allowance for "material difference".

**Count VII**

**(Breach of Contract - Overall Limitation-Material Difference - Alternative)**

37. Pennsauken Towers re-alleges the allegations contained in Paragraphs 1-36 of this Complaint as if fully rewritten herein.

38. In the alternative, if HUD had not breached the Pennsauken Towers HAP Contract as alleged in paragraph 36, it breached said contract by failing to apply the appropriate Overall Limitation of 120% of the sum of comparable rent and initial difference for the anniversary years 1995 through the date of filing of this Complaint.

**Count VIII**

**(Breach of Contract - Comparability Studies and Time Limits)**

39. Pennsauken Towers re-alleges the allegations contained in Paragraphs 1-38 of this Complaint as if fully rewritten herein.

40. HUD further breached the Pennsauken Towers HAP Contract by its application of the Directive's 60-day time limit and the requirement of Pennsauken Towers to obtain

comparability studies in order to obtain annual rent adjustments for the years 2001 through the date of the filing of this Complaint.

WHEREFORE, Pennsauken Towers prays that this Court award it money damages in the amount of at least $709,400, all additional money damages suffered by Pennsauken Towers arising out of HUD's breach of the Pennsauken Towers HAP Contract, all other money damages suffered by Pennsauken Towers from the filing of the within Complaint until entry of judgment, such additional other amounts that are proved at trial, together with pre- and post-judgment interest, attorney fees and any such declaratory and other relief that the Court deems proper.

Respectfully submitted,

Dated: 3/14/07

Fred J. Livingstone (0009528)
Mark J. Valponi (0009527)
Majeed G. Makhlouf (0073853)
TAFT, STETTINIUS & HOLLISTER LLP
3500 BP Tower
200 Public Square
Cleveland, Ohio 44114-2302
(216) 241-2838

Attorneys for Plaintiffs

PENNSAUKEN HOUSING ASSOCIATES, A LIMITED PARTNERSHIP

and

HOUSING AUTHORITY OF THE TOWNSHIP OF PENNSAUKEN

# LEASE AGREEMENT

DATED AS OF DECEMBER 1, 1979

EXHIBIT A

TABLE OF CONTENTS

This Table of Contents is not a part of the Lease Agreement and is only for convenience of reference.

Parties ............................................... 1
Recitals .............................................. 1

ARTICLE I

DEFINITIONS AND CONSTRUCTION

SECTION 1.01. Definitions................................ 2
SECTION 1.02. Construction............................... 4

ARTICLE II

REPRESENTATIONS

SECTION 2.01. Representations of the Issuer............... 6
SECTION 2.02. Representations of the Lessee............... 6

ARTICLE III

LEASE OF PROJECT AND RENTALS

SECTION 3.01. Lease of Project........................... 7
SECTION 3.02. Term of Lease.............................. 7
SECTION 3.03. Basic Rent................................. 7
SECTION 3.04. Pledge of Basic Rent ...................... 8
SECTION 3.05. Additional Security........................ 8
SECTION 3.06. Equipment.................................. 8
SECTION 3.07. Annual Budgets............................. 8

ARTICLE IV

COVENANTS OF LESSOR AND LESSEE

SECTION 4.01. Operation of Project....................... 9
SECTION 4.02. Maintenance of Project..................... 9

SECTION 4.03. Additions, Modifications and Improvements... 9
SECTION 4.04. Insurance.................................. 9
SECTION 4.05. Liens...................................... 9
SECTION 4.06. Taxes and Other Governmental Charges........ 10
SECTION 4.07. Utility Charges............................ 10
SECTION 4.08. Project Occupancy.......................... 10
SECTION 4.09 Request for Housing Assistance Payments..... 11

ARTICLE V

DAMAGE, DESTRUCTION AND CONDEMNATION

SECTION 5.01. Damage or Destruction; Condemnation......... 12

ARTICLE VI

ASSIGNMENT OF LEASE; MORTGAGE OR PROJECT BY LESSOR; TERMINATION OF LEASE; CONVEYANCE OF PROJECT; OPTION TO PURCHASE

SECTION 6.01. Assignment of Lease by Lessee............... 13
SECTION 6.02. Mortgage of Project by Lessor............... 13
SECTION 6.03. Termination of Lease; Reference to Bonds Ineffective After Bonds Paid............. 13
SECTION 6.04. All Funds Held by the Trustee to be Paid to Lessee on Expiration of Lease.......... 13

ARTICLE VII

CONCERNING THE HAP AGREEMENT AND THE HAP CONTRACT

SECTION 7.01. Compliance With Terms and Provisions of HAP Agreement and HAP Contract................................ 15
SECTION 7.02. Exercise of Renewals........................ 15
SECTION 7.03. Adjustments Under HAP Contract.............. 15
SECTION 7.04. Modification or Amendment of HAP Agreement or HAP Contract................. 15

ARTICLE VIII

EVENTS OF DEFAULT AND REMEDIES


SECTION 8.01. Events of Default.......................... 16
SECTION 8.02. Remedies................................... 16
SECTION 8.03. Disposition of Funds....................... 17
SECTION 8.04. Manner of Exercise......................... 17
SECTION 8.05. Effect of Waiver........................... 17
SECTION 8.06. Waiver of Stay or Extension Laws........... 18
SECTION 8.07. Trustee's Exercise of Lessor's Remedies..... 18


ARTICLE IX

MISCELLANEOUS


SECTION 9.01. Notices.................................... 19
SECTION 9.02. Binding Effect............................. 19
SECTION 9.03. Severability............................... 19
SECTION 9.04. Executed Counterparts...................... 19
SECTION 9.05. Applicable Laws............................ 19
SECTION 9.06. No Recourse to Lessor...................... 20

THIS LEASE AGREEMENT, dated as of December 1, 1979, between PENNSAUKEN HOUSING ASSOCIATES, a limited partnership organized and existing under the laws of the State of New Jersey (the "Lessor") and the HOUSING AUTHORITY OF THE TOWNSHIP OF PENNSAUKEN, a public body corporate and politic organized and existing under the laws of the State of New Jersey (the "Lessee");

WITNESSETH:

WHEREAS, the Lessor intends to construct a 100 unit low income housing project for the elderly at a location approximately 600 feet northeast from the corner of Haddonfield Road and Maple Avenue, in the Township of Pennsauken, New Jersey, constituting a portion of Lot 2 in Block 495 on Plate 53 of the Tax Maps of the Township of Pennsauken, New Jersey (to be designated Lot 6 in Block 495) (the "Project") with the intention of leasing the Project to the Lessee; and

WHEREAS, to finance the cost of acquiring the Project the Lessor will obtain financing on a temporary and permanent basis from the Housing Finance Corporation of the Township of Pennsauken (the "Corporation") which will issue $4,800,000 Construction Notes (the "Construction Notes") and $4,800,000 Section 8 Assisted Housing Revenue Bonds (the "Bonds"), respectively, for such purpose; and

WHEREAS, the Lessee has heretofore entered into an Agreement to Enter Into Housing Assistance Payments Contract ("HAP Agreement"), with the United States of America acting through the Department of Housing and Urban Development ("HUD") pursuant to the provisions and requirements of Section 8 of the United States Housing Act of 1937, as amended and supplemented (the "Act"), which agreement provides for the execution of a Housing Assistance Payments Contract ("HAP Contract") upon completion of the Project and its acceptance by HUD; and

WHEREAS, under the terms of the HAP Contract, HUD will pay to the Lessee housing assistance payments on behalf of Eligible Tenants occupying the Project; and

WHEREAS, the Lessor and the Lessee desire to enter into this Lease so as to enable the Lessee to sublet dwelling units in the Project to tenants;

NOW, THEREFORE, in consideration of the respective covenants and agreements on the part of the parties herein contained, the parties hereto respectively recite, represent, warrant, covenant and agree as follows:

ARTICLE I.

DEFINITIONS AND CONSTRUCTION.

SECTION 1.01. Definitions. In addition to words and terms elsewhere defined in this Lease, the following words and terms as used in this Lease shall have the following meanings, unless some other meaning is plainly intended.

"Act" means the United States Housing Act of 1937, as amended and supplemented;

"Basic Rent" means the rent payable under Section 3.03 herein;

"Bonds" means the Housing Revenue Bonds of the Issuer, issued pursuant to the Indenture to permanently finance the Project;

"Construction Loan Agreement" means agreement among the Corporation, the Company and the Construction Lender, dated as of December 1, 1979, relative to the interim financing of the Cost of Construction of the Project.

"Construction Notes" means the Notes of the Issuer issued pursuant to the Construction Loan Agreement to provide the construction financing for the Project;

"Corporation" means the Housing Finance Corporation of the Township of Pennsauken;

"Counsel" means an attorney designated by or acceptable to the Trustee, duly admitted to practice law before the highest court of the State of New Jersey;

"Credit Agreement" means the agreement between the Issuer, the Trustee and the Lessor dated as of December 1, 1979, regarding the permanent financing of the Project by the Issuer;

"Current Expenses" means expenses incurred or to be incurred by the Lessor in the operation and maintenance of the Project determined on a cash basis, but shall exclude Basic Rent;

"Eligible Tenants" means persons of lower income or other families who qualify for housing assistance under Section 8 of the Act and the rules and regulations promulgated thereunder from time to time;

"Equipment" means the furnishings, equipment and appliances and any other furnishings, equipment and appliances substituted therefor located at the Project;

"Event of Default" means any event set forth in section 8.01 of the Lease;

"Extraordinary Maintenance" means major maintenance, repair and replacement which may be required at the Project, including but not limited to, replacement of equipment, appliances and fixtures, repair or replacement of any roof or other structural component of the Project exterior or interior, painting and major repair or replacements to carpeting, the heating, air conditioning, plumbing and electrical systems;

"Facility" means the housing facility consisting of 100 dwelling units located wholly within the boundaries of the Project Site, including incidental space, facilities and rights of ingress and egress;

"Fiscal Year" means the calendar year;

"Government" means the United States of America, acting through the Department of Housing and Urban Development, or its successor;

"HAP Agreement" means the Agreement to Enter Into Housing Assistance Payments Contract, as may be amended, by and between HUD and the Lessee;

"HAP Contract" means the agreement to be entered into by HUD and Lessee upon completion and acceptance of the Project by HUD in accordance with Section 8 of the United States Housing Act of 1937, as amended and the regulations promulgated thereunder by which Housing Assistance Payments are made on behalf of Eligible Tenants;

"HAP Payments" means the amounts payable by HUD on behalf of Eligible Tenants under the HAP Contract;

"Housing Revenue Bonds" means the Bonds hereinbefore described;

"HUD" means the United States Department of Housing and Urban Development, its successors and assigns;

"Indenture" means the Indenture of Trust dated as of December 1, 1979 by and between the Issuer and the Trustee;

"Issuer" means the Housing Finance Corporation of the Township of Pennsauken and its successors and assigns;

"Lease" or "Lease Agreement" means this Lease Agreement as it now exists or as it may be amended or supplemented;

"Lease Payments" means all sums payable to the Lessor pursuant to the Lease;

"Lessee" means the Housing Authority of the Township of Pennsauken, New Jersey, and its successors and assigns;

"Lessor" means Pennsauken Housing Associates, a New Jersey limited partnership;

"Mandatory Sinking Fund Installments" means the mandatory sinking fund installments as defined by the Indenture;

"Plans and Specifications" means the drawings and specifications for the Project heretofore approved by the Lessee and HUD and identified in the Indenture;

"Project" means the Project Site, the Facility and the Equipment as they may at any time exist, and all other property and rights of every kind leased or intended to be leased hereunder;

"Project Site" means the real property located approximately 600 feet northeast from the corner of Haddonfield Road and Maple Avenue, in the Township of Pennsauken, constituting a portion of Lot 2 in Block 495 on Plate 53 of the Tax Maps of the Township of Pennsauken, New Jersey, (to be designated Lot 6 in Block 495) on which the Project is located;

"State" means the State of New Jersey;

"Trustee" means First National State Bank of New Jersey, a national banking association, as Trustee and its successor or any co-trustee under the Indenture.

SECTION 1.02. <u>Construction</u>. Words of the masculine gender shall be deemed and construed to include correlative words of the feminine and neuter genders. Words importing the singular number shall include the plural number and vice versa

unless the context shall otherwise indicate. The word "person" shall include corporations, associations, natural persons and public bodies unless the context shall otherwise indicate.

## ARTICLE II.

## REPRESENTATIONS.

SECTION 2.01. Representations of the Lessor. The Lessor makes the following representations as the basis for the undertakings on its part herein contained:

(a) The Lessor is a limited partnership organized and existing under the laws of the State;

(b) The Lessor has acquired title to the Project Site and will construct the Project thereon;

(c) The Lessor has the power to enter into the transactions contemplated by this Lease and to carry out its obligations hereunder and by proper corporate action the Lessor has been duly authorized to execute and deliver this Lease;

(d) The Lessor has entered into a Construction Loan Agreement and a Credit Agreement with the Issuer in order to obtain the construction and permanent financing for the acquisition and construction of the Project.

SECTION 2.02. Representation of the Lessee. The Lessee makes the following representations as the basis for the undertakings on its part herein contained:

(a) The Lessee is a public body corporate and politic organized and validly existing under the laws of the State;

(b) The Lessee has the power to enter into the transactions contemplated by this Lease and to carry out its obligations hereunder and by proper official action has been duly authorized to execute and deliver this Lease;

(c) The Lessee has entered into the HAP Agreement with HUD providing for the payment, upon completion of the Project satisfactorily to HUD and execution of the HAP Contract, of HAP Payments with respect to units in the Project for the benefit of Eligible Tenants upon the terms and conditions stated therein.

ARTICLE III.

LEASE OF PROJECT AND RENTALS.

SECTION 3.01. Lease of Project. The Lessor does hereby lease and devise the Project to the Lessee, and the Lessee does hereby lease and rent the Project from the Lessor, for and during the term herein specified.

SECTION 3.02. Term of Lease. The term of this Lease shall, except as otherwise provided, be the lesser of thirty (30) years or such other time as Bonds remain outstanding pursuant to the Indenture, to commence upon the effective date of the HAP Contract, and, except as provided in Sections 5.01 and 6.04 hereof, to terminate on the termination date of the HAP Contract. Lessee agrees that the HAP Contract shall be executed by itself and HUD immediately upon completion of the Project and acceptance of the Project by HUD as provided in the Indenture and that the HAP Contract shall be effective as of the completion date as defined in the Indenture.

SECTION 3.03. Basic Rent. The Lessee agrees to pay to the Lessor as Basic Rent for the Project, as a special obligation payable solely from revenues generated from the Project, as and when received, but in any event at least five (5) days prior to the first day of each month during the term of this Lease an amount equal to the sum of all income received from or in connection with the operation of the Project, including but not limited to, HAP Payments, tenant rentals and other revenues generated from the Project. The Lessee, in order to meet its obligation under the HAP Contract, reserves the right, upon a written determination of the Lessee, with the consent of HUD and the Trustee, that the Lessor has failed to maintain and operate the Project in accordance with the HAP Contract or has taken actions or failed to have taken actions which will result in the Project not being maintained and operated in accordance with the HAP Contract, to withhold that amount of Basic Rent necessary for operation and maintenance expenses of the Project. Such amounts shall continue to be withheld until such time as evidence is supplied to HUD or the Trustee, as the case may be, by the Lessor that it is willing and able to operate and maintain the Project consistent with the requirements imposed on the Lessee pursuant to the HAP Contract. The Trustee, during such time, shall apply such withheld amount directly to the payment of operation and maintenance expenses on behalf of the Lessor. The Lessee shall first withhold moneys paid by the Project's tenants, and, to the extent such monies are insufficient to provide for the proper operation and maintenance of the Project, HAP Payments received from HUD shall be utilized for such purposes.

SECTION 3.04. Pledge of Basic Rent. All Basic Rent properly paid and payable hereunder is hereby pledged to the extent not otherwise encumbered by the Lessor to the Trustee on behalf of the Issuer as security for the loan of the Issuer issued pursuant to the Credit Agreement and Indenture to finance the Project. The Lessee and the Lessor will join in the preparation of any documents or the filing of any financing statements in connection with this assignment and pledge. The obligation of the Lessee to pay Basic Rent is a special obligation of Lessee payable solely from funds received from tenants of the Project or from HUD pursuant to the HAP Contract.

SECTION 3.05. Additional Security. As further security for its obligations under this Lease Agreement, Lessee hereby assigns to the Trustee on behalf of the Issuer all right, title and interest in all moneys and claims described in the Assignment attached hereto as Exhibit A and hereby incorporated by reference as if set forth at length.

SECTION 3.06. Equipment. Lessor agrees to equip the Project as provided in the Plans and Specifications submitted to HUD by Lessee.

SECTION 3.07. Annual Budgets. Prior to the beginning of each Fiscal Year the Management Agent shall prepare or cause to be prepared on behalf of the Lessee, a budget of anticipated revenues and expenses for each Fiscal Year and submit it to the Lessor and the Trustee for their approval.

ARTICLE IV.

COVENANTS OF LESSOR AND LESSEE.

SECTION 4.01. Operation of Project. The Lessor will operate the Project so that Lessee may comply with all rules and regulations of HUD which are or which may become applicable to the Project. The Lessee agrees to use its best efforts to keep all of the dwelling units occupied by Eligible Tenants so as to assure that there is no reduction in the amount of Housing Assistance Payments payable to the Lessee by HUD by reason of the lack of occupancy of the Project.

SECTION 4.02. Maintenance of Project. The Lessor will maintain or cause to be maintained each dwelling unit constituting a part of the Project in decent, safe and sanitary condition. Lessor shall be responsible for all ordinary and Extraordinary Maintenance in connection with the Project. All costs, expenses and fees shall be paid by or on behalf of the Lessor whether or not revenues received are adequate therefor.

SECTION 4.03. Additions, Modifications and Improvements. The Lessor may from time to time, with the approval of HUD, at its own expense, make any additions, modifications or improvements to the Project, located wholly within the boundary lines of the Project Site, that do not adversely affect the structural integrity or value of the Facility. All additions, modifications and improvements made by the Lessor shall become a part of the Project and shall be deemed to be leased to the Lessee.

SECTION 4.04. Insurance. The Lessor hereby covenants and agrees to maintain or cause to be maintained all policies of insurance provided in the Credit Agreement, and naming the Lessee, the Issuer and the Trustee as additional insureds.

SECTION 4.05. Liens. Neither the Lessor nor the Lessee will permit any mechanics' or other liens to be filed or established or to remain against the Project for labor or materials furnished in connection with any repairs, renewals, replacements, additions, modifications or improvements, provided that if the Lessor or Lessee shall first notify the Trustee, it may in good faith contest any mechanics' or other lien filed or established and in such event may permit the items contested to remain undischarged and unsatisfied during the period of such contest and any appeal therefrom unless the Trustee shall notify

the Lessor or Lessee that, in the opinion of Counsel, by nonpayment of any such items the lien of the Indenture as to any part of the Project will be materialy endangered or the Project or any part thereof will be subject to loss or forfeiture, in which event the Lessor or Lessee, as the case may be, shall promptly pay all such unpaid items and cause them to be satisfied and discharged, provided that the Lessor or Lessee, as the case may be, shall undertake to apply all costs and expenses incurred by the Issuer and indemnify the Issuer and save it harmless against any risks, claims or liabilities arising out of such contest.

SECTION 4.06. Taxes and Other Governmental Charges. The Lessor will pay, as the same respectively become due, all taxes and payments in lieu of taxes that may be assessed or levied against or payable with respect to the Project. The Lessor may at its own expense, in good faith contest any such taxes or payments in lieu of taxes and in the event of such contest, may permit the items so contested to remain unpaid during the period of the contest and any appeal therefrom, unless the Trustee shall notify the Lessor that, in the opinion of Counsel, by nonpayment of any such items the lien of the Indenture as to any part of the Project will be materially endangered or the Project or any part thereof will be subject to loss or forfeiture, in which event such taxes, assessments or payments in lieu thereof shall be promptly paid.

SECTION 4.07. Utility Charges. The Lessor hereby agrees to pay or cause to be paid all utility charges relating to the operation of the Project.

SECTION 4.08. Project Occupancy. The Lessee covenants, in order to assure to the maximum extent possible that the 100 dwelling units of the Project will be fully and continually occupied, that subject to applicable laws and regulations it will use its best efforts to aid and assist the Management Agent in subleasing the units to Eligible Tenants and will make known any vacancies in the Project to tenants who are tenants in other dwelling units owned and/or managed by the Lessee. The Management Agent shall be selected by the Lessor with the approval of Lessee, such consent not to be unreasonably withheld. Tenant selection shall be in accordance with the Management Contract. Tenant selection shall in all events be in accordance with HUD requirements. The Management Contract shall be executed by the Lessor, the Lessee and the Management Agent.

The Lessee shall conduct monthly inspections of the Project to insure that the Project is being maintained and operated in decent, safe and sanitary condition.

SECTION 4.09. Request for Housing Assistance Payments. On or before the tenth day of each month during the term of the HAP Contract, and any renewals thereof, the Lessee or the Management Agent on the Lessee's behalf shall submit to HUD monthly requests for the payment of Housing Assistance Payments for the next succeeding month with respect to the Project together with a specific direction to HUD that such payments shall be made to the Trustee. The Trustee shall deposit such payments into the Revenue Fund established under the Indenture and disburse them pursuant to the Indenture. Such deposits shall be credited to the Lessor against its obligations under the Note and Mortgage referred to in the Credit Agreement or shall otherwise be expended on behalf of Lessor.

ARTICLE V.

DAMAGE, DESTRUCTION AND CONDEMNATION.

SECTION 5.01. Damage or Destruction; Condemnation.

(a) In the event of the damage to or the destruction of the Project, or any part thereof, the Lessee will give immediate notice to the Lessor, the Issuer and the Trustee who may make proof of loss to any insurer and each insurer is hereby authorized and directed to make payment for such loss directly to the Trustee for application pursuant to the terms of the Indenture and Credit Agreement;

(b) In the event that the Project or any part thereof is condemned by any power of eminent domain, the condemnation award for such taking is hereby assigned to the Trustee for application pursuant to the terms of the Indenture and Credit Agreement.

## ARTICLE VI.

## ASSIGNMENT OF LEASE; MORTGAGE OF PROJECT BY LESSOR; TERMINATION OF LEASE.

SECTION 6.01. Assignment of Lease by Lessee. The Lessee may assign this Lease and the leasehold interest created hereby only with the consent of the Lessor, the Trustee and HUD. No assignee or anyone claiming under any such assignment shall acquire any greater rights in the Project or in any part thereof than the Lessee, and no such assignment shall relieve the Lessee from primary liability for any obligations hereunder. In the event of any such assignment, the Lessee shall continue to remain primarily liable for payment of the rental and other obligations hereunder, and for performance and observance of the other agreements and covenants to be performed and observed by the Lessee hereunder.

SECTION 6.02. Mortgage of Project by Lessor. Pursuant to the Credit Agreement the Lessor will mortgage the Project to the Issuer who in turn will assign its interest to the Trustee as security for payment of the principal of and the interest on the Bonds. The Trustee shall have all rights and remedies herein accorded the Lessor and any reference herein to the Lessor shall be deemed to include the Trustee, and the Trustee and the holders of the Bonds shall be deemed to be third party beneficiaries of the covenants and agreements of the Lessee contained herein. Prior to payment in full of the principal of and interest on the Bonds, the Lessor and the Lessee shall not modify, alter, amend or (except as specifically authorized herein) terminate this Lease without the prior written consent of the Trustee and HUD and then only as provided in the Indenture, and the Lessor shall not consent to any amendment to the Indenture or authorize any indenture supplemental thereto without the prior written consent of the Lessee.

SECTION 6.03. Termination of Lease; References to Bonds Ineffective After Bonds Paid. At the option of either the Lessor or the Lessee, upon full payment of all of the Bonds in original or refunded form, and payment or provision for payment of all other charges due or accrued pursuant to this Lease, this Lease shall terminate and all references in this Lease to the Bonds and the Trustee shall be ineffective and neither the Trustee nor the holders of any of the Bonds shall thereafter have any rights hereunder.

SECTION 6.04. All Funds Held by the Trustee to be Paid to the Lessor on Expiration of the Lease. Upon the termination

of this Lease either by expiration of the term hereof or in accordance with Section 6.03 hereof, all money not otherwise payable to the Issuer then on deposit in any of the funds created in the Indenture to the extent not payable to HUD or the Corporation or the Bondholders, as provided therein, shall be the exclusive property of the Lessor.

ARTICLE VII.

CONCERNING THE HAP AGREEMENT
AND THE HAP CONTRACT.

SECTION 7.01. Compliance With Terms and Provisions of HAP Agreement and HAP Contract. The Lessee covenants to file with HUD all information and documentation requested or necessary to establish the Completion Date, as defined in the Indenture, and will execute the HAP Contract upon such completion of the Project and will do and perform all acts and things in its control to establish the Completion Date and allow release of the moneys held by the Trustee in the Indenture's Construction Mortgage Discharge Fund and will comply with the terms and provisions of the HAP Agreement and the HAP Contract.

SECTION 7.02. Exercise of Renewals. The Lessee agrees to exercise renewal terms under the HAP Contract to the extent necessary to keep the HAP Contract in force and effect while any Bonds are outstanding.

SECTION 7.03. Adjustments Under HAP Contract. The Lessee or the Management Agent, on the Lessee's behalf, shall apply to HUD for "Special Additional Adjustment of Contract Rents" under the HAP Contract to the extent that the Lessee or Lessor incurs increases in actual and necessary expenses of operating and maintaining the Project and is entitled to such adjustments.

SECTION 7.04. Modification or Amendment of HAP Agreement or HAP Contract. The Lessee agrees that it shall not consent to any modification or amendment of the HAP Agreement or the HAP Contract without the prior written approval of the Lessor and the Trustee, and the Trustee shall not approve any such modification or amendment unless such modification or amendment shall not, in the judgment of the Trustee, impair the security for the Bonds.

ARTICLE VIII.

EVENTS OF DEFAULT AND REMEDIES.

SECTION 8.01. Events of Default. Any one or more of the following events is an Event of Default under this Lease:

(a) failure of the Lessee to pay the rental specified in Sections 3.03 and 3.04 hereof on or before the date payment is due except that withholding of the Basic Rent or any portion thereof by Lessee as provided in Section 3.03 shall not constitute such failure;

(b) failure of the Lessee to observe and perform any other covenant, condition or agreement on its part under this Lease for a period of thirty (30) days after written notice, specifying such default and requesting that it be remedied, given to the Lessee;

(c) if the Lessee shall file a petition in bankruptcy or for reorganization or for an arrangement pursuant to any present or future federal bankruptcy act or under any similar federal or state law, or shall make an assignment for the benefit of its creditors or shall admit in writing its inability to pay its debts generally as they become due, or if a petition or answer proposing the adjudication of the Lessee as a bankrupt or its reorganization under any present or future federal bankruptcy act or any similar federal or state law shall be filed in court and such petition or answer shall not be discharged or denied within sixty (60) days after the filing thereof, or a receiver, trustee or liquidator of the Lessee or of all or substantially all of the assets of the Lessee or of the Project shall be appointed in any proceeding brought against the Lessee and shall not be discharged within sixty (60) days after such appointment or if the Lessee shall consent to or acquiese in such apppointment, or of the estate or interest of the Lessee in the Project or any part thereof shall be levied upon or attached in any proceeding and such process shall not be vacated or discharged within ten (10) days after such levy or attachment, of the Lessee shall be dissolved or liquidated;

(d) failure of the Lessee to meet its obligations under the HAP Contract.

SECTION 8.02. Remedies. Whenever any Event of Default referred to in Section 8.01 shall have happened and be continuing any one or more of the following remedies may be exercised by the Lessor with the prior consent of the Trustee:

(a) The Lessor may re-enter and take possession of the Project without termination of this Lease, and use its best efforts to lease the Project for the account of the Lessee holding the Lessee liable, as a special obligation payable solely from revenues generated from the Project, for the difference in the rent and other amounts payable by any lessee and the rents and other amounts payable by the Lessor hereunder;

(b) the Lessor with the permission of HUD may terminate the term of this Lease, exclude the Lessee from possession of the Project, and use its best efforts to lease the Project for the account of the Lessee;

(c) the Lessor may require the Lessee to furnish copies of all books and records of the Lessee pertaining to the Project; and/or

(d) the Lessor may take whatever action at law or in equity may appear necessary or appropriate to collect the Basic Rent then due and therafter to become due, or to enforce performance and observance of any obligation, agreement or covenant of the Lessee under this Lease.

SECTION 8.03. Disposition of Funds. Any amounts collected pursuant to action taken under Section 8.02 shall be paid to the Trustee and applied in accordance with the provisions of the Indenture.

SECTION 8.04. Manner of Exercise. No remedy herein conferred upon to the Lessor is intended to be exclusive of any other available remedy or remedies, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Lease or now or hereafter existing at law or in equity. No delay or omission to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver thereof, but any such right and power may be exercised from time to time and as often as may be deemed expedient. In order to entitle the Lessor to exercise any remedy reserved to it in this Article VIII, it shall not be necessary to give any notice other than such notice as may be herein expressly required.

SECTION 8.05. Effect of Waiver. In the event any agreement contained in this Lease should be breached by either party and thereafter waived by the other party, such waiver shall be limited to the particular breach so waived and shall not be deemed to waive any other breach.

SECTION 8.06. Waiver of Stay or Extension Laws. To the extent permitted by law, the Lessee covenants not to plead, or in any manner claim the advantage of, any stay or extension law, now or at any time hereafter in force, which may affect the covenants or the performance of this Lease or the Indenture, and to the extent permitted by law, the Lessee hereby expressly waives all benefit or advantage of any such law, and covenants that it will not hinder, delay or impede the execution of any power herein granted to the Lessor or the Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

SECTION 8.07. Trustee's Exercise of the Lessor's Remedies. Whenever any Event of Default shall have happened and is continuing under the Indenture the Trustee may exercise any of the remedies of the Lessor under this Article VIII.

ARTICLE IX.

MISCELLANEOUS.

SECTION 9.01. Notices. All notices, certificates or other communications hereunder shall be sufficiently given and shall be deemed given when mailed by certified or registered mail, postage prepaid, with proper address, as indicated below. The Lessor, the Lessee and the Trustee may, by written notice given by each to the others, designate any address or addresses to which notices, certificates or other communications to them shall be sent when required as contemplated by this Lease. Until otherwise provided by the respective parties, all notices, certificates and communications to each of them shall be addressed as follows:

To the Lessor: 645 Fifth Avenue, New York, New York
Attention: Stephen M. Ross

To the Lessee: Municipal Building
Pennsauken, New Jersey
Attention: Julie Sapounakis

The the Trustee: 550 Broad Street, Newark, New Jersey
Attention: Trust Department

To HUD: Gateway One, Newark, New Jersey
Attention: Legal Department

SECTION 9.02. Binding Effect. This Lease shall inure to the benefit of and shall be binding upon the Lessor and the Lessee and their respective successors and assigns.

SECTION 9.03. Severability. In the event any provision of this Lease shall be held invalid or unenforceable by any court of competent jurisdiction, such holding shall not invalidate or render unenforceable any other provision thereof.

SECTION 9.04. Executed Counterparts. This Lease may be simultaneously executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument.

SECTION 9.05. Applicable Laws. This Lease shall be governed exclusively by the provisions hereof and by the applicable laws of the State or where appropriate the laws of the United States.

SECTION 9.06 No Recourse to Lessor. No recourse shall be had for any claim based on any provision of this Lease Agreement against any member, officer or employee, past, present or future, of the Lessor, or any of its general or limited partners, or of any successor bodies as such, either directly or through the Lessor or any such successor bodies, under any constitutional provision, statute or rule of law or by the enforcement of any assessment or penalty or otherwise.

IN WITNESS WHEREOF, the Lessor by General Partner and the Lessee have caused this Lease to be executed in their respective names and the Lessee's corporate seal to be hereunto affixed and attested all as of the day first above written and executed this 28th day of December, 1979.

PENNSAUKEN HOUSING ASSOCIATES

By: Related Housing Companies Incorporated
General Partner

By: ~~Vice~~ President
EXEC.

[SEAL]

ATTEST:

~~Assistant Secretary~~ V.P.

HOUSING AUTHORITY OF THE TOWNSHIP OF PENNSAUKEN

By
Leon B. Strat, Chairperson

ATTEST:

Julie Sapounakis, Secretary

[SEAL]

C

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
SECTION 8 HOUSING ASSISTANCE PAYMENTS PROGRAM
NEW CONSTRUCTION

PART I OF THE

# HOUSING ASSISTANCE PAYMENTS CONTRACT

PRIVATE-OWNER OR PHA-OWNER PROJECT

| HAP CONTRACT LIST NUMBER AND DATE: | PROJECT NUMBER: |
|---|---|
| NY-39-628 September 29, 1979 | NJ16-0029-001 |

This Housing Assistance Payments Contract ("Contract") is entered into by and between the United States of America acting through the Department of Housing and Urban Development ("Government"), and HOUSING AUTHORITY OF THE ** ("Owner"), pursuant to the United States Housing Act of 1937 ("Act"), 42 U.S.C. 1437, et seq., and the Department of Housing and Urban Development Act, 42 U.S.C. 3531, et seq.

** TOWNSHIP OF PENNSAUKEN

The parties hereto agree as follows:

1.1 SIGNIFICANT DATES AND OTHER ITEMS: CONTENTS OF CONTRACT.

a. The term of the Contract shall be 30 years.

b. The effective date of the Contract shall be 10 working days after the notification of project completion to the Government, or the date of the Government inspection if earlier, provided that the Owner's and Architect's Certifications and other evidence of completion is found by the Government to be acceptable as of that date. If the certifications and other evidence of completion are found not to be acceptable as of that date, the effective date of the Contract shall be the earliest subsequent date of which the evidence of completion is found by the Government to be acceptable. The effective date of this Contract has been established as March 17, 1981.

c. Fiscal Year. The ending date of each Fiscal Year (see Section 1.4b) shall be ________ (insert March 31, June 30, September 30, or December 31, as determined by the Government).

d. Maximum Housing Assistance Commitment. The maximum amount of the commitment for housing assistance payments under this Contract (see Section 1.5a) is $ 615,600.00 per annum.

e. Contents of Contract. This Contract consists of Part I, Part II, and the following exhibits:

Exhibit A: The Schedule showing the number of units by size ("Contract Units") and their applicable rents ("Contract Rents");

Exhibit B: The project description;

Exhibit C: The statement of services, maintenance and utilities to be provided by Owner;

Exhibit D: The Affirmative Fair Housing Marketing Plan, if applicable; and

Additional exhibits: (Specify additional exhibits, if any. If none, insert "None.")

Exhibit E: Daily Debt Service Schedule

This Contract, including such exhibits, comprises the entire agreement between the parties hereto with respect to the matters contained herein, and neither party is bound by any representations or agreements of any kind except as contained herein or except agreements entered into in writing which are not inconsistent with this Contract.

1.2 OWNER'S WARRANTIES.

a. Legal Capacity. The Owner warrants that he has the legal right to execute this Contract and to lease dwelling units covered by this Contract.

b. Completion of Work. The Owner warrants that the project as described in Exhibit B is in good and tenantable condition and that the project has been completed in accordance with the terms and conditions of the Agreement to Enter into Housing Assistance Payments Contract ("Agreement") or will be completed in accordance with the terms on which the project was accepted. The Owner further warrants that he will remedy any defects or omissions covered by this warranty if called to his attention within 12 months of the effective date of this Contract. The Owner and the Government agree that the continuation of this Contract shall be subject to the conditions set forth in Section 1.4f of the Agreement.

1.3 FAMILIES TO BE HOUSED; GOVERNMENT ASSISTANCE.

a. Families To Be Housed. The Contract Units are to be leased by the Owner to eligible Lower Income Families ("Families") for use and occupancy by such Families solely as private dwellings. Since the project has been financed with tax-exempt obligations, the Owner shall be required to continue to provide low-income housing for the full term of the Contract".

b. Government Assistance.

(1) The Government hereby agrees to make housing assistance payments on behalf of Families for the Contract Units, to enable such Families to lease Decent, Safe, and Sanitary housing pursuant to section 8 of the Act. Such housing assistance payments shall equal the difference between the Contract Rents for units leased by Families and the portion of such rents payable by Families as determined by the Owner in accordance with schedules and criteria established by the Government.

(2) If there is an Allowance for Utilities and Other Services and if such Allowance exceeds the Gross Family Contribution, the Owner shall pay the Family the amount of such excess on behalf of the Government upon receipt of funds from the Government for that purpose.

EXHIBIT
tabbies
B

1.4 TERM OF CONTRACT; FISCAL YEAR.

a. Term of Contract.

[Alternative provisions -incorporate alternative 1 or 2, as applicable.]

Alternative 1 - General:

The initial term of this Contract shall be as stated in Section 1.1b. This Contract may be renewed, at the sole option of the Owner, for the number and length of additional terms stated in Section 1.1c, provided that the total Contract term for any unit, including all renewals, shall not exceed the number of years stated in Section 1.1d. Renewal shall be automatic unless the Owner notifies the Government, no later than 60 days prior to the expiration of the current term, of his intention not to renew. If the project is completed in stages, the dates for the initial term and renewal terms shall be separately related to the units in each stage; Provided, however, that the total Contract term for all the stages, beginning with the effective date of the Contract with respect to the first stage, shall not exceed the total Contract term stated in Section 1.1d, plus two years. In any case where the project is owned by, or financed by a loan or loan guarantee from, a State or local agency, the housing assistance payments pursuant to this Contract with respect to any dwelling unit shall be payable over a period not to exceed 40 years.

Alternative 2 – For mobile homes project:

In the case of mobile homes, the initial term of this Contract for each mobile home shall be as stated in Section 1.1b. This Contract shall be renewed, as may be mutually agreed upon by the Owner and the Government, with respect to any mobile home, for the number and length of additional terms as stated in Section 1.1c, provided that the total Contract term for any mobile home, including all renewals, shall not exceed the number of years stated in Section 1.1d. Renewals shall become effective only if either party gives written notice, no later than 60 days prior to the expiration of the current term, of his desire to renew, and the other party consents or fails to object before the expiration of the current term. If the project is completed in stages, the dates for the initial term and renewal term shall be separately related to the mobile homes in each stage; Provided, however, that the total Contract term for all the stages, beginning with the effective date of the Contract with respect to the first stage, shall not exceed the total Contract term stated in Section 1.1d, plus two years. For purposes of this paragraph a, the term "mobile home" means the original mobile home and any replacement so [illegible].

b. Fiscal Year. The Fiscal Year for the project shall be the 12-month period ending on the date stated in Section 1.1e. Provided, however, that the first Fiscal Year for the project shall be the period beginning with the effective date of the Contract and ending on the last day of said established Fiscal Year which is not less than 12 months after such effective date. If the first Fiscal Year exceeds 12 months, the maximum total annual housing assistance payment in Section 1.5a may be adjusted by the addition of the pro rata amount applicable to the period of operation in excess of 12 months.

1.5 MAXIMUM HOUSING ASSISTANCE COMMITMENT; PROJECT ACCOUNT.

a. Maximum Housing Assistance Commitment. Notwithstanding any other provisions of this Contract (other than paragraph b of this Section) or any provisions of any other contract between the Government and the Owner, the Government shall not be obligated to make and shall not make any housing assistance payments under this Contract in excess of the amount per annum stated in Section 1.1d. Provided, however, that this amount shall be reduced commensurately with any reduction in the number of Contract Units or in the Contract Rents or pursuant to any other provisions of this Contract.

b. Project Account. In order to assure that housing assistance payments will be increased on a timely basis to cover increases in Contract Rents or decreases in Family Incomes:

(1) A Project Account shall be established and maintained, in an amount as determined by the Government consistent with its responsibilities under section 8(c)(6) of the Act, out of amounts by which the maximum Contract commitment per year exceeds amounts paid under the Contract for any Fiscal Year. This account shall be established and maintained by the Government as a specifically identified and segregated account. To the extent funds are available in said account, the maximum total annual housing assistance payments for any Fiscal Year may exceed the maximum amount stated in paragraph a of this Section to cover increases in Contract Rents or decreases in Family Incomes (see Section 1.8). Any amount remaining in said account after payment of the last housing assistance payment with respect to the project shall be applied by the Government in accordance with law.

(2) Whenever the Government approved estimate of the required Annual Contribution exceeds the maximum Contract commitment then in effect, and would cause the amount in the Project Account to be less than an amount equal to 40 percent of such maximum Contract commitment, the Government shall, within a reasonable period of time, take such additional steps authorized by section 8(c)(6) of the Act as may be necessary to carry out this assurance, including (as provided in that section of the Act) "the reservation of annual contributions authority for the purpose of amending housing assistance contracts or the allocation of a portion of new authorizations for the purpose of amending housing assistance contracts."

1.6 HOUSING ASSISTANCE PAYMENTS TO OWNERS.

a. General.

(1) Housing assistance payments shall be paid to the Owner for units under lease by Families in accordance with the Contract. The housing assistance payment will cover the difference between the Contract Rent and that portion of said rent payable by the Family as determined in accordance with the Government-established schedules and criteria.

(2) The amount of housing assistance payment payable on behalf of a Family and the amount of rent payable by such Family shall be subject to change by reason of changes in Family Income, Family composition, or extent of exceptional medical or other unusual expenses, in accordance with the Government-established schedules and criteria, or by reason of adjustment by the Government of any applicable Allowance for Utilities and Other Services. Any such change shall be effective as of the date stated in a notification of such change to the Family.

b. Vacancies During Rent-up. If a Contract Unit is not leased as of the effective date of the Contract, the Owner shall be entitled to housing assistance payments in the amount of 80 percent of the Contract Rent for the unit for a vacancy period not exceeding 60 days from the effective date of the Contract, provided that the Owner (1) commenced marketing and otherwise complied with Section 1.3b of the Agreement, (2) has taken and continues to take all feasible actions to fill the vacancy, including, but not limited to, contacting applicants on his waiting list, if any, requesting the Public Housing Agency ("PHA") and other appropriate sources to refer eligible applicants, and advertising the availability of the unit, and (3) has not rejected any eligible applicant, except for good cause acceptable to the Government.

c. Vacancies After Rent-up.

(1) If a Family vacates its unit (other than as a result of action by the Owner which is in violation of the Lease or the Contract or any applicable law), the Owner shall receive housing assistance payments in the amount of 80 percent of the Contract Rent for a vacancy period not exceeding 60 days; Provided, however, that if the Owner collects any of the Family's share of the rent for this period in an amount which, when added to the 80 percent payments, results in more than the Contract Rent, such excess shall be payable to the Government or as the Government may direct. (See also Section 1.9e.) The Owner shall not be entitled to any payment under this [illegible] paragraph [illegible] (i) [illegible] the vacancy [illegible] the Government of the vacancy [illegible] [illegible] [illegible]

(2) If the Owner evicts a Family, he shall not be entitled to any payment under paragraph c(1) of this Section unless the request for such payment is supported by a certification that (i) he gave such Family a written notice of the proposed eviction, stating the grounds and advising the Family that it had 10 days within which to present its objections to the Owner in writing or in person and (ii) the proposed eviction was not in violation of the Lease or the Contract or any applicable law.

d. Limitation on Payments for Vacant Units. The Owner shall not be entitled to housing assistance payments with respect to vacant units under this Section to the extent he is entitled to payments from other sources (e.g., payments for losses of rental income incurred for holding units vacant for relocatees pursuant to Title I of the Housing and Community Development Act of 1974 or payments under Section 1.9b of this Contract).

e. Government Not Obligated for Family Rent. The Government has not assumed any obligation for the amount of rent payable by any Family or the satisfaction of any claim by the Owner against any Family other than in accordance with Section 1.9b of this Contract. The financial obligation of the Government is limited to making housing assistance payments on behalf of Families in accordance with this Contract.

f. Owner's Monthly Requests for Payments.

(1) The Owner shall submit monthly requests to the Government for housing assistance payments. Each such request shall set forth: (i) the name of each Family and the address and/or number of the unit leased by the Family; (ii) the address and/or the number of units, if any, not leased to Families for which the Owner is claiming payments; (iii) the Contact Rent as set forth in Exhibit A for each unit for which the Owner is claiming payments; (iv) the amount of rent payable by the Family leasing the unit (or, where applicable, the amount to be paid the Family in accordance with Section 1.3b(2); and (v) the total amount of housing assistance payments requested by the Owner.

(2) Each of the Owner's monthly requests shall contain a certification by him that to the best of his knowledge and belief (i) the dwelling units are in Decent, Safe, and Sanitary condition, (ii) all the other facts and data on which the request for funds is based are true and correct, (iii) the amount requested has been calculated in accordance with the provisions of this Contract and is payable under the Contract, and (iv) none of the amount claimed has been previously claimed or paid.

(3) If the Owner has received an excessive payment, the Government, in addition to any other rights to recovery, may deduct the amount from any subsequent payment or payments.

(4) The Owner's monthly requests for housing assistance payments shall be made subject to penalty under 18 U.S.C. 1001, which provides, among other things, that whoever knowingly and willfully makes or uses a document or writing containing any false, fictitious, or fraudulent statement or entry, in any matter within the jurisdiction of any department or agency of the United States, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

g.[1] Recoupment of Savings in Financing Cost.

(1) In the event that interim financing is continued after the first year of the term of the Contract and the debt service of the interim financing for any period of three months, after such first year, is less than the anticipated debt service under the permanent financing on which the Contract Rents were based, an amount reflecting the savings in financing cost, computed in accordance with paragraph g(2) of this Section, shall be credited by the Government to the Project Account, and withheld from housing assistance payments to the Owner. If during the course of the same year there is any period of three months in which the debt service is greater than the anticipated debt service under the permanent financing, an adjustment shall be made so that only the net amount of savings in financing cost for the year is credited by the Government to the Project Account and withheld from housing assistance payments to the Owner as aforesaid (no increased payments shall be made to the Owner on account of any net excess for the year of actual interim debt service over the anticipated debt service under the permanent financing). Nothing in this paragraph g shall be construed as requiring a reduction in the Contract Rents or precluding adjustments of Contract Rents in accordance with Section 1.8.

(2) The computation and recoupment under this paragraph g may be made on an annual or on a quarterly or other periodic basis, but in any event no later than as of the end of each Fiscal Year; Provided, however, that if recoupment is to be made less often than quarterly, the amounts of recoupment shall be computed on at least a quarterly basis and the funds shall be deposited in a special account from which withdrawals may be made only with the authorization of the Government. The manner of computing the amount of recoupment shall be as follows:

(i) Determine the amount by which the debt service for the interim financing for the period in question is less than the anticipated debt service under the permanent financing on which the Contract Rents were based;

(ii) Determine what percentage the amount found under paragraph g(2)(i) of this Section is of the aggregate Contract Rents for all Contract Units for the period in question;

(iii) Apply the percentage found in paragraph g(2)(ii) of this Section to the aggregate Contract Rents for those Contract Units which are included in the Owner's claim(s) for housing assistance payments for the period in question; and

(iv) The amount found in paragraph g(2)(iii) of this Section shall be credited to the Project Account and withheld from the next housing assistance payment or payments to the Owner.

h. Debt Service Payments

(See attached "Addendum" which is hereby incorporated and made a part of this Contract).

1.7 MAINTENANCE, OPERATION AND INSPECTION.

a. Maintenance and Operation. The Owner agrees (1) to maintain and operate the Contract Units and related facilities so as to provide Decent, Safe, and Sanitary housing, and (2) to provide all the services, maintenance and utilities set forth in Exhibit C. If the Government determines that the Owner is not meeting one or more of these obligations, the Government shall have the right, in addition to its other rights and remedies under this Contract, to abate housing assistance payments in whole or in part.

b. Inspection.

(1) Prior to occupancy of any unit by a Family, the Owner and the Family shall inspect the unit and both shall certify, on forms prescribed by the Government, that they have inspected the unit and have determined it to be Decent, Safe, and Sanitary in accordance with the criteria provided in the prescribed forms. Copies of these reports shall be kept on file by the Owner for at least three years.

[1] Delete this paragraph unless the project is subject to 24 CFR, Section 880.125.

(2) The Government shall inspect or cause to be inspected each Contract Unit and related facilities at least annually and at such other times (including prior to initial occupancy and rerenting of any unit) as may be necessary to assure that the Owner is meeting his obligation to maintain the units in Decent, Safe, and Sanitary condition and to provide the agreed upon utilities and other services. The Government shall take into account complaints by occupants and any other information coming to its attention in scheduling inspections and shall notify the Owner and the Family of its determination.

c. Units Not Decent, Safe, and Sanitary. If the Government notifies the Owner that he has failed to maintain a dwelling unit in Decent, Safe, and Sanitary condition and the Owner fails to take corrective action within the time prescribed in the notice, the Government may exercise any of its rights or remedies under the Contract, including abatement of housing assistance payments, even if the Family continues to occupy the unit. If, however, the Family wishes to be rehoused in another dwelling unit with section 8 assistance and the Government does not have other section 8 funds for such purposes, the Government may use the abated housing assistance payments for the purpose of rehousing the Family in another dwelling unit. Where this is done, the Owner shall be notified that he will be entitled to resumption of housing assistance payments for the vacated dwelling unit if (1) the unit is restored to Decent, Safe, and Sanitary condition, (2) the Family is willing to and does move back into the restored unit, and (3) a deduction is made for the expenses incurred by the Family for both moves.

d. Notification of Abatement. Any abatement of housing assistance payments shall be effective as provided in written notification to the Owner. The Government shall promptly notify the Family of any such abatement.

e. Overcrowded and Underoccupied Units. If the Government determines that a Contract Unit is not Decent, Safe, and Sanitary by reason of increase in Family size, or that a Contract Unit is larger than appropriate for the size of the Family in occupancy, housing assistance payments with respect to such unit will not be abated, unless the Owner fails to offer the Family a suitable unit as soon as one becomes vacant and ready for occupancy. In the case of an overcrowded unit, if the Owner does not have any suitable units or if no vacancy of a suitable unit occurs within a reasonable time, the Government will assist the Family in finding a suitable dwelling unit and require the Family to move to such a unit as soon as possible. The Owner may receive housing assistance payments for the vacated unit if he complies with the requirements of Section 1.6e(1).

1.8 RENT ADJUSTMENTS.

a. Funding of Adjustments. Housing assistance payments will be made in increased amounts commensurate with Contract Rent adjustments under this Section, up to the maximum amount authorized under Section 1.5a of this Contract.

b. Automatic Annual Adjustments.

(1) Automatic Annual Adjustment Factors will be determined by the Government at least annually; interim revisions may be made as market conditions warrant. Such Factors and the basis for their determination will be published in the Federal Register. These published Factors will be reduced appropriately by the Government where utilities are paid directly by the Families.

(2) On each anniversary date of the Contract, the Contract Rents shall be adjusted by applying the applicable Automatic Annual Adjustment Factor most recently published by the Government. Contract Rents may be adjusted upward or downward, as may be appropriate; however, in no case shall the adjusted Contract Rents be less than the Contract Rents on the effective date of the Contract.

c. Special Additional Adjustments. Special additional adjustments shall be granted, when approved by the Government, to reflect increases in the actual and necessary expenses of owning and maintaining the Contract Units which have resulted from substantial general increases in real property taxes, utility rates, or similar costs (i.e., assessments, and utilities not covered by regulated rates), but only if and to the extent that the Owner clearly demonstrates that such general increases have caused increases in the Owner's operating costs which are not adequately compensated for by automatic annual adjustments. The Owner shall submit to the Government financial statements which clearly support the increase.

d. Overall Limitation. Notwithstanding any other provisions of this Contract, adjustments as provided in this Section shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Government; provided, that this limitation shall not be construed to prohibit differences in rents between assisted and comparable unassisted units to the extent that such differences may have existed with respect to the initial Contract Rents.

e. Incorporation of Rent Adjustment. Any adjustment in Contract Rents shall be incorporated into Exhibit A by a dated addendum to the exhibit establishing the effective date of the adjustment.

f.[2] Adjustment to Reflect Actual Cost of Permanent Financing. This paragraph f shall apply if the project is not permanently financed until after the effective date of the Contract. After the project is permanently financed, the Financing Agency shall submit a certification to the Government as to the actual financing terms. If the actual debt service under the permanent financing is lower than the anticipated debt service on which the Contract Rents were based, the Contract Rents currently in effect shall be reduced commensurately, and the amount of the savings shall be credited to the Project Account. The maximum Contract commitment shall not be reduced. If the actual debt service is higher, the Contract Rents shall not be increased.

1.9 MARKETING AND LEASING OF UNITS.

a. Compliance with Equal Opportunity. Marketing of units and selection of Families by the Owner shall be in accordance with the Owner's Government-approved Affirmative Fair Housing Marketing Plan, shown as Exhibit D, and with all regulations relating to fair housing advertising.

b. Security and Utility Deposits.

(1) The Owner may require Families to pay a security deposit in an amount equal to one month's Gross Family Contribution. If a Family vacates its unit, the Owner, subject to State and local law, may utilize the deposit as reimbursement for any unpaid rent or other amount owed under the Lease. If the Family has provided a security deposit, and it is insufficient for such reimbursement, the Owner may claim reimbursement from the Government, not to exceed an amount equal to the remainder of one month's Contract Rent. Any reimbursement under this Section shall be applied first toward any unpaid rent. If a Family vacates the unit owing no rent or other amount under the Lease or if the amount owed is less than the amount of the security deposit, the Owner shall refund the full amount or the unused balance, as the case may be, to the Family.

(2) In those jurisdictions where interest is payable by the Owner on Security deposits, the refunded amount shall include the amount of interest payable. All security deposit funds shall be deposited by the Owner in a segregated bank account, and the balance of this account, at all times, shall be equal to the total amount collected from tenants then in occupancy, plus any accrued interest. The Owner shall comply with all State and local laws regarding interest payments on security deposits.

(3) Families shall be expected to obtain the funds to pay security and utility deposits, if required, from their own resources and/or other private or public sources.

[2] Delete this paragraph unless the project is subject to 24 CFR, Section 880.125.

c. Eligibility, Selection and Admission of Families.

(1) The Owner shall be responsible for determination of eligibility of applicants, selection of families from among those determined to be eligible, and computation of the amount of housing assistance payments on behalf of each selected Family in accordance with schedules and criteria established by the Government. In the initial renting of the Contract Units, the Owner shall lease at least 30 percent to Very Low-Income Families (determined in accordance with the Government-established schedules and criteria) and shall thereafter exercise his best efforts to maintain at least 30 percent occupancy of the Contract Units by Very Low-Income Families as determined in accordance with such schedules and criteria.

(2) The Lease entered into between the Owner and each selected Family shall be on the form of Lease approved by the Government

(3) The Owner shall make a reexamination of Family Income, composition, and the extent of medical or other unusual expenses incurred by the Family, at least annually (except that such reviews may be made at intervals of no longer than two years in the case of elderly Families), and appropriate redeterminations shall be made by the Owner of the amount of Family contribution and the amount of housing assistance payment, all in accordance with schedules and criteria established by the Government. In connection with the reexamination, the Owner shall determine what percentage of Families in occupancy are Very Low-Income Families. If there are fewer than 30 percent Very Low-Income Families in occupancy, the Owner shall report the fact to the Government and shall adopt changes in his admission policies to achieve, as soon as possible, at least 30 percent occupancy by such Families.

d. Rent Redetermination after Adjustment in Allowance for Utilities and Other Services. In the event that the Owner is notified of a Government determination making an adjustment in the Allowance for Utilities and Other Services applicable to any of the Contract Units, the Owner shall promptly make a corresponding adjustment in the amount of rent to be paid by the affected Families and the amount of housing assistance payments.

e. Processing of Applications and Complaints. The Owner shall process applications for admission, notifications to applicants, and complaints by applicants in accordance with applicable Government requirements and shall maintain records and furnish such copies or other information as may be required by the Government.

f. Government Review; Incorrect Payments. In making housing assistance payments to Owners, the Government will review the Owner's determinations under this Section. If as a result of this review, or other reviews, audits or information received by the Government at any time, it is determined that the Owner has received improper or excessive housing assistance payments, the Government shall have the right to deduct the amount of such overpayments from any amounts otherwise due the Owner, or otherwise effect recovery thereof

1.10 TERMINATION OF TENANCY. The Owner shall be responsible for termination of tenancies, including evictions. However, conditions for payment of housing assistance payments for any resulting vacancies shall be as set forth in Section 1.6c.

1.11 REDUCTION OF NUMBER OF CONTRACT UNITS FOR FAILURE TO LEASE TO ELIGIBLE FAMILIES.

a. After First Year of Contract. If at any time, beginning six months after the effective date of this Contract, the Owner fails for a continuous period of six months to have at least 80 percent of the Contract Units leased or available for leasing by Families, the Government may on 30 days notice reduce the number of Contract Units to not less than the number of units under lease or available for leasing by Families, plus 10 percent of such number if the number is 10 or more, rounded to the next highest number.

b. At End of Initial and Each Renewal Term. At the end of the initial term of the Contract and of each renewal term, the Government may, by notice to the Owner, reduce the number of Contract Units to not less than (1) the number of units under lease or available for leasing by Families at that time or (2) the average number of units so leased or available for leasing during the last year, whichever is the greater number, plus 10 percent of such number if the number is 10 or more, rounded to the next highest number.

c. Restoration of Units. The Government will agree to an amendment of the Contract to provide for subsequent restoration of any reduction made pursuant to paragraph a or b of this Section if the Government determines that the restoration is justified as a result of changes in demand and in the light of the Owner's record of compliance with his obligations under this Contract and if annual contributions contract authority is available; and the Government will take such steps authorized by section 8(c)(6) of the Act as may be necessary to carry out this assurance (see Section 1.5).

WARNING: 18 U.S.C. 1001 provides, among other things, that whoever knowingly and willfully makes or uses a document or writing containing any false, fictitious, or fraudulent statement or entry, in any matter within the jurisdiction of any department or agency of the United States, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

1.12 RELATIONSHIP TO AGENCY OR INSTRUMENTALITY (See attached Page 5(a)

OWNER HOUSING AUTHORITY OF THE TOWNSHIP OF [illegible]

By [illegible]

[illegible]

(Official Title)

Date [illegible] 17, 19 [illegible]

United States of America
Secretary of Housing and Urban Development

By [illegible]

[illegible]

(Official Title)

Date 6/9, 19 81

[If the project is to be completed and accepted in stages, execution of the Contract with respect to the several stages appears on the following pages of this Contract.]

1.12 RELATIONSHIP TO AGENCY OR INSTRUMENTALITY

(a) The Parent Entity PHA shall perform the following functions with regard to the Agency or Instrumentality PHA:

(1) Approve amendments to the charter or other organic documents and of the by-laws of the Agency or Instrumentality PHA only upon receiving the prior approval of the Government in writing.

(2) Approve each project and the program and expenditures of the Agency and Instrumentality PHA and thereafter require full compliance with the project program and projected expenditures that were submitted to and approved by the Parent Entity PHA.

(3) Review and approve each issue of obligations not more than 60 days prior to the date of issue and review and approve any substantive changes to the terms and conditions of the issuance prior to the date of issue.

(4) Approve substantive changes to the financing documents submitted to the Government pursuant to Part 811 and the applicable Section 8 regulations (e.g. trust indenture or note and mortgage, etc.), only upon receiving the prior approval of the Government in writing.

(5) Review the biennal financial audit of the Agency or Instrumentality PHA by an independent public accountant and review the activities of such PHA to determine whether it is complying with all contractual requirements and the Section 8 and Part 811 regulations, including the requirement that any compensation received by the PHA in excess of its expenditures be placed in the debt service reserve, and submit copies of the audit and reviews to the Government.

(6) The PHA shall perform all such functions in compliance with all applicable HUD regulations.

(b) The Parent Entity PHA agrees to accept title to or other interest in real or personal property of the Agency or Instrumentality PHA upon dissolution of such PHA or pursuant to arrangements for such title or interest to be conveyed to the Parent Entity PHA at a specified time and/or under specified conditions and shall upon acquisition of such title or interest comply with any outstanding Section 8 or Part 811 requirements.

EXECUTION OF CONTRACT WITH RESPECT
TO CONTRACT UNITS COMPLETED AND ACCEPTED
IN STAGES

STAGE 1

This Contract is hereby executived with respect to the units decribed in Exhibit A-1.

EFFECTIVE DATE. The effective date of this Contract is April 17, 19 87.
[Insert date which shall be no earlier than the date of Government acceptance of the project.]

OWNER ______
By Elizabeth Fuqua
Chairman
(Official Title)
Date April 17, 19 87

United States of America
Secretary of Housing and Urban Development

By ______
______ (Official Title)
Date ______, 19 ______

EXECUTION OF CONTRACT WITH RESPECT
TO CONTRACT UNITS COMPLETED AND ACCEPTED
IN STAGES

STAGE 2

This Contract is hereby executed with respect to the units described in Exhibit A-2.

EFFECTIVE DATE. The Effective date of this Contract is ______, 19 ______.
[Insert date which shall be no earlier than the date of Government acceptance of the project.]

OWNER ______
By ______
______ (Official Title)
Date ______, 19 ______

United States of America
Secretary of Housing and Urban Development

By ______
______ (Official Title)
Date ______

EXECUTION OF CONTRACT WITH RESPECT
TO CONTRACT UNITS COMPLETED AND ACCEPTED
IN STAGES

STAGE 3

This Contract is hereby executed with respect to the units described in Exhibit A-3.

EFFECTIVE DATE. The effective date of this Contract is ______, 19 ______.
[Insert date which shall be no earlier than the date of Government acceptance of the project.]

OWNER ______
By ______
______ (Official Title)
Date ______, 19 ______

United States of America
Secretary of Housing and Urban Development

By ______
______ (Official Title)
Date ______, 19 ______

h. Debt-Service Vacancy Payments

(1) If a unit continues to be vacant after the 60-day period specified in paragraph b. or c. of this section, the owner may submit a claim to receive additional housing assistance payments on a semi-annual basis with respect to the vacant unit in an amount equal to the principal and interest payments required to amortize the portion of the debt attributable to that unit for the period of the vacancy, whether the vacancy commenced during rent-up or after rent-up.

(2) Additional payments under this paragraph h. for any unit shall not be more than 12 months for any vacancy period, and shall be made only if:

(i) The unit was in decent, safe and sanitary condition during the vacancy period for which payments are claimed.

(ii) The Owner has taken and is continuing to take the actions specified in paragraphs b.(1), (2) and (3) or paragraphs c.(1) (i) and (ii) and c.(2) of this section, as appropriate.

(iii) The owner has demonstrated, in connection with the semiannual claim on a form and in accordance with the standards prescribed by HUD with respect to the period of the vacancy, that the project is not providing the owner with revenues at least equal to the project costs incurred by the owner and that the amount of the payments requested is not in excess of the amount needed to make up the deficiency.

(iv) The owner has submitted to HUD or the PHA, as appropriate, in connection with the semiannual claim, a statement with relevant supporting evidence that there is a reasonable prospect that the project can achieve financial soundness within a reasonable time. The statement shall indicate the causes of the deficiency; the corrective steps that have been and will be taken; and the time by which it is expected that the project revenues will at least equal project costs without the additional payments provided under this paragraph.

(3) HUD or the PHA, as appropriate, may deny any claim for additional payments or suspend or terminate payments if it determines that, based on the owner's statement and other evidence, there is not a reasonable prospect that the project can achieve financial soundness within a reasonable time.

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
SECTION 8 HOUSING ASSISTANCE PAYMENTS PROGRAM
NEW CONSTRUCTION

PART II OF THE

# HOUSING ASSISTANCE PAYMENTS CONTRACT

PRIVATE-OWNER OR PHA OWNER PROJECT

| HAP CONTRACT LIST NUMBER AND DATE. | PROJECT NUMBER |
|---|---|
| NY-39-628 September 29, 1979 | NJ16-0029-001 |

2.1 NONDISCRIMINATION IN HOUSING

a. The Owner shall not in the selection of Families, in the provision of services, or in any other manner, discriminate against any person on the grounds of race, color, creed, religion, sex, or national origin. No person shall be automatically excluded from participation in, or be denied the benefits of, the Housing Assistance Payments Program because of membership in a class such as unmarried mothers, recipients of public assistance, etc.

b. The Owner shall comply with all requirements imposed by Title VIII of the Civil Rights Act of 1968, and any rules and regulations pursuant thereto.

c. The Owner shall comply with all requirements imposed by Title VI of the Civil Rights Act of 1964, Public Law 88-352, 78 Stat. 241; the regulations of the Department of Housing and Urban Development issued thereunder, 24 CFR, Subtitle A, Part 1, Section 1.1, et seq.; the requirements of said Department pursuant to said regulations; and Executive Order 11063 to the end that, in accordance with that Act, the regulations and requirements of said Department thereunder, and said Executive Order, no person in the United States shall, on the grounds of race, color, creed, religion or national origin, be excluded from participation in, or be denied the benefits of, the Housing Assistance Payments Program, or be otherwise subjected to discrimination. This provision is included pursuant to the regulations of the Department of Housing and Urban Development, 24 CFR, Subtitle A, Part 1, Section 1.1, et seq. issued under Title VI of the said Civil Rights Act of 1964, and the requirements of said Department pursuant to said regulations; and the obligation of the Owner to comply therewith inures to the benefit of the Government and the said Department, either of which shall be entitled to invoke any remedies available by law to redress any breach thereof or to compel compliance therewith by the Owner.

2.2 TRAINING, EMPLOYMENT, AND CONTRACTING OPPORTUNITIES FOR BUSINESSES AND LOWER-INCOME PERSONS.[3]

a. The project assisted under this Contract is subject to the requirements of section 3 of the Housing and Urban Development Act of 1968, as amended, 12 U.S.C. 170lu. Section 3 requires that, to the greatest extent feasible, opportunities for training and employment be given lower-income residents of the project area and contracts for work in connection with the project be awarded to business concerns which are located in, or owned in substantial part by persons residing in, the area of the project.

b. Notwithstanding any other provision of this Contract, the Owner shall carry out the provisions of said section 3 and the regulations issued pursuant thereto by the Secretary of Housing and Urban Development set forth in 24 CFR, Part 135 (published in 38 Federal Register 29220, October 23, 1973), and all applicable rules and orders of the Secretary issued thereunder prior to the execution of this Contract. The requirements of said regulations include, but are not limited to, development and implementation of an affirmative action plan for utilizing business concerns located within, or owned in substantial part by persons residing in, the area of the project; the making of a good faith effort, as defined by the regulations, to provide training, employment, and business opportunities required by section 3, and incorporation of the "section 3 clause" specified by section 135.20(b) of the regulations and paragraph d of this Section in all contracts for work in connection with the project. The Owner certifies and agrees that he is under no contractual or other disability which would prevent him from complying with these requirements.

c. Compliance with the provisions of section 3, the regulations set forth in 24 CFR, Part 135, and all applicable rules and orders of the Secretary issued thereunder prior to approval by the Government of the application for this Contract, shall be a condition of the Federal financial assistance provided to the project, binding upon the Owner, his successors and assigns. Failure to fulfill these requirements shall subject the Owner, his contractors and subcontractors, his successors, and assigns to the sanction specified by this Contract, and to such sanctions as are specified by 24 CFR, Section 135.135.

d. The Owner shall incorporate or cause to be incorporated into any contract or subcontract for work pursuant to this Contract in excess of $50,000 cost, the following clause:

"EMPLOYMENT OF PROJECT AREA RESIDENTS AND CONTRACTORS

"A. The work to be performed under this Contract is on a project assisted under a program providing direct Federal financial assistance from the Department of Housing and Urban Development and is subject to the requirements of section 3 of the Housing and Urban Development Act of 1968, as amended, 12 U.S.C. 170lu. Section 3 requires that, to the greatest extent feasible, opportunities for training and employment be given lower-income residents of the project area and contracts for work in connection with the project be awarded to business concerns which are located in, or owned in substantial part by persons residing in, the area of the project.

"B. The parties to this Contract will comply with the provisions of said section 3 and the regulations issued pursuant thereto by the Secretary of Housing and Urban Development set forth in 24 CFR, Part 135, and all applicable rules and orders of the Department issued thereunder prior to the execution of this Contract. The parties to this Contract certify and agree that they are under no contractual or other disability which would prevent them from complying with these requirements.

"C. The contractor will send to each labor organization or representative of workers with which he has a collective bargaining agreement or other contract or understanding, if any, a notice advising the said labor organization or workers' representative of his commitments under this section 3 clause and shall post copies of the notice in conspicuous places available to employees and applicants for employment or training.

"D. The contactor will include this section 3 clause in every subcontract for work in connection with the project and will, at the direction of the applicant for or recipient of Federal financial assistance, take appropriate action pursuant to the subcontract upon a finding that the subcontract is in violation of regulations issued by the Secretary of Housing and Urban Development, 24 CFR, Part 135. The contractor will not subcontract with any subcontractor where it has notice or knowledge that the latter has been found in violation of regulations under 24 CFR, Part 135, and will not let any subcontract unless the subcontractor has first provided it with a preliminary statement of ability to comply with the requirements of these regulations.

[3] Strike this Section if the Contract Rents on the effective date of this Contract, over the maximum term of this Contract, are $500,000 or less.

"E. Compliance with the provisions of section 3, the regulations set forth in 24 CFR, Part 135, and all applicable rules and orders of the Department issued thereunder prior to the execution of the Contract, shall be a condition of the Federal financial assistance provided to the project, binding upon the applicant or recipient for such assistance, its successors, and assigns. Failure to fulfill these requirements shall subject the applicant or recipient, its contractors and subcontractors, its successors, and assigns to those sanctions specified by the grant or loan agreement or contract through which Federal assistance is provided, and to such sanctions as are specified by 24 CFR, Section 135.135."

c. The Owner agrees that he will be bound by the above Employment of Project Area Residents and Contractors clause with respect to his own employment practices when he participates in federally assisted work.

2.3 COOPERATION IN EQUAL OPPORTUNITY COMPLIANCE REVIEWS. The Owner shall cooperate with the Government in the conducting of compliance reviews and complaint investigations pursuant to all applicable civil rights statutes, Executive Orders, and rules and regulations pursuant thereto.

2.4 FLOOD INSURANCE. If the project is located in an area that has been identified by the Secretary of Housing and Urban Development as an area having special flood hazards and if the sale of flood insurance has been made available under the National Flood Insurance Act of 1968, the Owner agrees that the project will be covered, during its anticipated economic or useful life, by flood insurance in an amount at least equal to its development or project cost (less estimated land cost) or to the maximum limit of coverage made available with respect to the particular type of property under the National Flood Insurance Act of 1968, whichever is less.

2.5 CLEAN AIR ACT AND FEDERAL WATER POLLUTION CONTROL ACT.[4] In compliance with regulations issued by the Environmental Protection Agency ("EPA"), 40 CFR, Part 15, 39 F.R. 11099, pursuant to the Clean Air Act, as amended ("Air Act"), 42 U.S.C. 1857, et seq., the Federal Water Pollution Control Act, as amended ("Water Act"), 33 U.S.C. 1251, et seq., and Executive Order 11738, the Owner agrees that:

a. Any facility to be utilized in the performance of this Contract or any subcontract shall not be a facility listed on the EPA List of Violating Facilities pursuant to section 15.20 of said regulations;

b. He will promptly notify the Department of Housing and Urban Development field office director of the receipt of any communication from the EPA indicating that a facility to be utilized for the Contract is under consideration to be listed on the EPA List of Violating Facilities;

c. He will comply with all the requirements of section 114 of the Air Act and section 308 of the Water Act relating to inspection, monitoring, entry, reports, and information, as well as all other requirements specified in section 114 and section 308 of the Air Act and the Water Act, respectively, and all regulations and guidelines issued thereunder; and

d. He will include or cause to be included the provisions of this Section in every nonexempt subcontract, and that he will take such action as the Government may direct as a means of enforcing such provisions.

2.6 REPORTS AND ACCESS TO PREMISES AND RECORDS.

a. The Owner shall furnish such information and reports pertinent to the Contract as reasonably may be required from time to time by the Government.

b. The Owner shall permit the Government or any of its duly authorized representatives to have access to the premises and, for the purpose of audit and examination, to have access to any books, documents, papers and records of the Owner that are pertinent to compliance with this Contract, including the verification of information pertinent to the housing assistance payments.

2.7 DEFAULT BY THE OWNER UNDER CONTRACT.

a. A default by the Owner under this Contract shall result if:

(1) The Owner has violated or failed to comply with any provision of, or obligation under, this Contract or of any Lease, or

(2) The Owner has asserted or demonstrated an intention not to perform some or all of his obligations under this Contract or under any Lease.

b. Upon a determination by the Government that a default has occurred, the Government shall notify the Owner and the Trustee of (1) the nature of the default, (2) the actions required to be taken and the remedies to be applied on account of the default (including actions by the Owner to cure the default, and, where appropriate, abatement of housing assistance payments in whole or in part and recovery of overpayments), and (3) the time within which the Owner shall respond with a showing that the Owner has taken all the actions required. If the Owner fails to respond or take action to the satisfaction of the Government, the Government shall have the right to take corrective action to achieve compliance in accordance with paragraph (c)(1), (2) or (3) of this Section or to terminate this Contract in whole or in part or to take other corrective action to achieve compliance.

c. Pursuant to paragraph (b) of this Section the Government may take the following corrective actions either directly or in conjunction with or acting through a PHA:

(1) Take possession of the p oject, bring any action necessary to enforce any rights of the Owner growing out of the project operation, and operate the project in accordance with the terms of this Contract until such time as the Government determines that Owner is again in a position to operate the project in accordance with terms of this Contract.

(2) Collect all rents and charges in connection with the operation of the project and use such funds to pay the necessary expenses of preserving the property and operating the project and to pay the Owner's obligations

[4] Strike this Section if the Contract Rents on the effective date of this Contract, over the maximum total term of this Contract, are $100,000 or less

(3) Apply to any Court, State or Federal, for specific performance of this Contract, for an injunction against any violation of the Contract, for the appointment of a receiver to take over and operate the project in accordance with the terms of the Contract, or for such other relief as may be appropriate, since the injury to the Government arising from a default under any of the terms of this Contract could be irreparable and the amount of damage would be difficult to ascertain.

d. The availability of any remedy under this Contract shall not preclude the exercise of any other remedy available under this Contract or under any provisions of law, nor shall any action taken in the exercise of any remedy be deemed a waiver of any other rights or remedies. Failure to exercise that or any other right or remedy at any time.

2.8 DISPUTES.

a. Except as otherwise provided herein, any dispute concerning a question of fact arising under this Contract which is not disposed of by agreement between the Department of Housing and Urban Development field office and the Owner may be submitted by the Owner to the Secretary of Housing and Urban Development. The decision of the Secretary or duly authorized representative for the resolution of such disputes shall be final and conclusive, unless determined by a court of competent jurisdiction to have been fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence. In connection with any proceeding under this Section, the Owner shall be afforded an opportunity to be heard and to offer evidence in support of its appeal.

b. This Section does not preclude consideration of questions of law in connection with the decision rendered under paragraph a of this Section: Provided, however, that nothing herein shall be construed as making final the decision of any administrative official, representative, or board, on a question of law.

2.9 INTEREST OF MEMBERS, OFFICERS, OR EMPLOYEES OF PHA, MEMBERS OF LOCAL GOVERNING BODY OR OTHER PUBLIC OFFICIALS. No member, officer, or employee of the PHA, no member of the governing body of the locality (city and county) in which the project is situated, no member of the governing body of the locality in which the PHA was activated, and no other public official of such locality or localities who exercises any functions or responsibilities with respect to the project [illegible] shall have any interest, direct or indirect, in this Contract or in any proceeds or benefits arising therefrom.

2.10 INTEREST OF MEMBER OF OR DELEGATE TO CONGRESS. No member of or delegate to the Congress of the United States of America or resident commissioner shall be admitted to any share or part of this Contract or to any benefits which may arise therefrom.

2.11 ASSIGNMENT, SALE OR FORECLOSURE.

a. The Owner agrees that he has not made and will not make any sale, assignment, or conveyance or transfer in any other form, of this Contract or the project or any part thereof or any of his interest therein, without the prior consent of the Government: Provided, however, that in the case of an assignment as security for the purpose of obtaining financing of the project, the Government shall consent in writing if the terms of the financing have been approved by the Government.

b. The Owner agrees to notify the Government promptly of any proposed action covered by paragraph a of this Section. The Owner further agrees to request the written consent of the Government in regard thereto.

c. (1) A transfer by the Owner, in whole or in part, or a transfer by a party having a substantial interest in said Owner, or transfers by more than one party of interests aggregating a substantial interest in said Owner, or any other similarly significant change in the ownership of interests in the Owner, or in the relative distribution thereof, or with respect to the parties in control of the Owner or the degree thereof, by any other method or means (e.g., increased capitalization, merger with another corporation or other entity, corporate or other amendments, issuance of new or additional ownership interests or classification of ownership interests or otherwise) shall be deemed an assignment, conveyance, or transfer for purposes of this Section 2.11. An assignment by the Owner to a limited partnership, in which no limited partner has a 25 percent or more interest and of which the Owner is the sole general partner, shall not be considered an assignment, conveyance, or transfer.

(2) The term "substantial interest" means the interest of any general partner, any limited partner having a 25 percent or more interest in the organization, any corporate officer or director, and any stockholder having a 10 percent or more interest in the organization.

(3) The Owner, and the party signing this Contract on behalf of said Owner, represent that they have the authority of all of the parties having ownership interests in the Owner to agree to this provision on their behalf and to bind them with respect thereto.

d. In the event of foreclosure, or assignment or sale to the financing agency in lieu of foreclosure, or in the event of assignment or sale agreed to by the financing agency and approved by the Government (which approval shall not be unreasonably delayed or withheld) or in the event the PHA takes over possession, operation or ownership of the project, housing assistance payments shall continue in accordance with the terms of this Contract.

Project No. NJ16-0029-001

EXHIBIT A

HOUSING ASSISTANCE PAYMENTS CONTRACT

| Contract Units | | |
| --- | --- | --- |
| Unit Size | No. of Units | Contract Rent |
| 1 Br. | 100 | $486 |

EXHIBIT B

HOUSING ASSISTANCE PAYMENTS CONTRACT

<u>Project Description:</u>

| | |
|---|---|
| Location | |
| Street Address: | Maple Avenue and Haddonfield Road |
| Municipality: | Pennsuaken |
| County: | Camden |
| State: | New Jersey |

| | |
|---|---|
| Type of Project: | Elderly |
| Number of Stories: | Eight |
| Foundation: | Slab on Grade |
| Basement Floor: | Slab on Grade |
| Number of Units: | 101 |
| Number of Buildings: | One |
| Accessory Buildings and Area: | Community Room |
| Recreation Facilities and Area: | Shuffleboard and Passive Recreation |

| | |
|---|---|
| Site Dimensions: | +/- 2 acres |
| Year Built: | Proposed Construction |
| Zoning: | Resolution of Cooperation |

| | |
|---|---|
| Construction Method: | Conventional |
| Structural System: | Wall Bearing |
| Floor System: | Precast Plank |
| Exterior Finish: | Brick |
| Heating System: | Hot Water Baseboard Common Areas |
| Air Conditioning System: | None |
| Parking: | 50 spaces |

Project No. NJ16-0029-001

EXHIBIT C

HOUSING ASSISTANCE PAYMENTS CONTRACT

Services and Utilities Provided by Owner:

Electric Range
Refrigerator
Kitchen Exhaust Fan
Laundry Facilities (coin operated)
Trash Removal
Shades
Drapery Track
Heat/Hot Water

EXHIBIT C

HOUSING ASSISTANCE PAYMENTS CONTRACT

SERVICES AND MAINTENANCE PROVIDED BY OWNER:

Market the dwelling units and lease at least 30% of the Contract units to families of very low incomes (50% of Median Income of SMSA).

Maintain files of applications for both eligible and ineligible families.

Recertify and verify family income annually.

Lease the units.

All costs for credit checks and the like will be borne by the management, not by the tenant (or applicant). There will be no registration fees, earnest money payments of the like, unless they will be refunded in total to the applicant on request provided the applicant has not yet signed a lease.

Collection of rents and other charges due.

Pursue legal steps if necessary for collection of accounts receivable and when appropriate, eviction of tenants.

Maintain good working relations with the residents and the community.

Assist the residents as appropriate to make necessary adjustments for the harmonious occupancy of the project.

Maintain written statements of management policies which accurately describe management practices, copies of which will be available for inspection by the LHA, HUD, the tenants, potential tenants and the general public.

Provide supportive social service referrals to families needing such assistance.

Provide both routine, non-routine and extraordinary maintenance for the satisfactory preservation and appearance of the project.

Provide all equipment, furniture, telephone service, office space and staff for the adequate management of the project

Provide all equipment, materials and supplies needed for the repair, maintenance and replacement of the physical plant.

Maintain occupancy and financial records as required by HUD and keep them conveniently available for inspection and/or audit.

Provision of adequate trash and garbage storage and disposal.

Grounds maintenance including but not limited to: Cutting of lawns; reseeding; maintenance of outdoor planting; and snow removal from walkways, exterior stairs and parking areas on a timely basis.

Prompt response to service calls including but not limited to: Calls with respect to refrigerators, ranges, plumbing, heating, electrical and hot water fixtures and systems, other appliances such as garbage disposals and air conditioning if provided by the owner, and broken, stuck or damaged doors, screens or windows.

Repainting and redecorating interior dwelling space not less frequently than every three years. Exterior surfaces as needed but not less frequently than every four years.

Prompt replacement of light bulbs and other lighting equipment in outdoor area.

Exterminating services on a regularly scheduled basis, but not less frequently than semi-annually.

Repair of all walked-on surfaces such as stairs, ramps walkways and parking lot surfaces on a timely basis.

AFFIRMATIVE FAIR HOUSING MARKETING PLAN

OCT 23 1979

EXHIBIT D

COMPLETE FORM AND SUBMIT TO: FAIR HOUSING AND EQUAL OPPORTUNITY DIRECTOR/SPECIALIST AREA/INSURING OFFICE

1. INTRODUCTION.

The Affirmative Fair Housing Marketing Regulations require that each applicant subject to these Regulations carry out an affirmative program to attract prospective buyers or tenants of all minority and non-minority groups to the housing, including Whites (non-minority) and members of minority groups [illegible] Negro/Black, Spanish American, American Indian, Oriental, or other minority groups in the Standard Metropolitan Statistical Areas (SMSA) or housing market area who may be subject to housing discrimination on the basis of race, color, religion, sex or national origin.

2. APPLICANT AND PROJECT IDENTIFICATION.

A. APPLICANT'S: John N. D'Anastasio and
NAME: Pennsauken Housing Authority
ADDRESS: c/o Pennsauken Municipal Bldg.
Merchantville Rd. at Rt. 130
Pennsauken, N.J.
TELEPHONE NO.: 609-665-1000

B. PROJECT OR CONTRACT NUMBER: NJ-16-00029-0001
SECTION OF ACT: Section 8
NUMBER OF UNITS: 100
PRICE OR RENTAL RANGE OF UNITS: FROM $ 410 TO $ 420

C. PROJECT:
NAME: Pennsauken Towers
LOCATION/ADDRESS: Maple Ave.
CITY: Pennsauken STATE: N.J.
COUNTY: Camden CENSUS TRACT: *6029.01

D. FOR MULTIFAMILY HOUSING ONLY
☒ ELDERLY ☐ NON ELDERLY

E. APPROXIMATE STARTING DATES
ADVERTISING: 1/80 OCCUPANCY: 7/80

3. TYPE OF AFFIRMATIVE MARKETING PLAN ☒ Project Plan ☐ Annual Plan (for scattered sites)
NOTE: A separate Annual Plan must be developed for each type area in which housing is to be built. Indicate the specific area for [illegible]
☐ Minority Area ☒ White (non minority) Area ☐ Mixed Area (with ___% minority residents)

4. DIRECTION OF MARKETING ACTIVITY:
Each applicant is required to carry out an affirmative marketing program to attract buyers or tenants of all minority and non-minority groups [illegible] housing. The purpose of this program is to assure that any group(s) of persons normally NOT likely to apply for the housing without special outreach efforts (because of existing neighborhood racial or ethnic patterns, price, and/or other factors) know about the housing, feel welcome to apply, and have the opportunity to buy or rent. Indicate below which group(s) are least likely to apply for the housing without special outreach efforts.
☐ White (non minority) ☒ Negro/Black ☒ Spanish American ☐ American Indian ☐ Oriental ☐ Other Minority (specify) ______

5. MARKETING PROGRAM: All advertising will include (a) methods to attract minority and non-minority persons, especially persons of [illegible] checked above, and (b) prominent use of the approved Equal Housing Opportunity Logotype, Slogan and/or Statement.

6. COMMERCIAL MEDIA: Check the media to be used to advertise the availability of this housing
☒ Newspaper(s)/Publication(s) ☐ Radio ☐ TV ☐ Billboard(s) ☐ Other (specify)
For the media identified above, provide the requested information. (If more space is needed attach an additional sheet.)

| NAME OF MEDIA | STATE IN PERCENTAGES THE RACIAL-ETHNIC IDENTIFICATIONS OF MAJOR READERS/AUDIENCE | | | | | | ADS PLACEMENTS |
|---|---|---|---|---|---|---|---|
| | White (non minority) | Negro/Black | Spanish American | American Indian | Oriental | Other Minority | Size and Duration |
| Courier Post | 90% | 10% | | | | | |
| Community News | 86% | 14% | | | | | |
| Todays Sunbeam | 15% | 30$ | 55% | | | | |

NOTE: Attach copy of ad or state when it will be submitted. See Attached

7. BROCHURES, SIGNS AND HUD'S FAIR HOUSING POSTER 1) Will brochures, leaflets or handouts be used to advertise? ☒ Yes ☐ No. [illegible] a copy or submit when available. 2) For project site signs, indicate sign size A x B; Logotype size 1 x 1. Attach a copy of sign or submit when available. 3) HUD's Fair Housing Poster must be conspicuously displayed wherever sales/rentals and showings take place. Posters will be displayed in the ☒ Sales/Rental Office(s) ☐ Real Estate Office(s) ☐ Model Unit(s) ☐ Other (specify) ______

See attached proposed sample.

8. COMMUNITY CONTACTS To further inform the group(s) least likely to apply about the availability of the housing, the applicant agrees to maintain contact with the groups/organizations located in the housing market area or SMSA listed below. [illegible] notify HUD/FHEO of any changes in this list. Submit a copy of correspondence to be mailed to these groups/organizations. [illegible]

| Name of Group/Organization | Racial/Ethnic Identification | Approximate Date of Contact or Proposed Contact | Person Contacted or to be Contacted | Address and Telephone No. | Method of Contact(s) | Indicate the specific function [illegible] |
|---|---|---|---|---|---|---|
| NAACP | Black | 1/80 | | 1123½ Kaighn Ave Camden, N.J. 365-5331 | letter | |
| Puerto Rican Convention | Spanish | 1/80 | | 222 E. State St. Camden, N.J. | Letter | |
| Commonwealth of Puerto Rico | Spanish | 1/80 | | 333 Arch St. Camden, N.J. | Letter | |

9. FUTURE MARKETING ACTIVITIES (Rental Only) Check the block(s) that best describe future marketing activities for [illegible] after the project has been initially occupied.
☒ Newspapers/Publications ☐ Radio ☐ TV ☐ Brochures/Leaflets/Handouts ☒ Site Signs ☐ Community Contacts
☐ Other (specify) ______

10. ANTICIPATED OCCUPANCY RESULTS [illegible]
92 White (non minority) 6 Negro/Black 2 [illegible]

| Name of Company, Address and Telephone No. | Job Classification | | STAFFING – Present: Totals | White (non-minority) | Negro/Blk | Spanish Am. | Am. Indian | Oriental | Other Minority | Anticipated: Vacancies | Date of 1st Opening | Recruitment steps taken or to be taken to attract all persons | [illegible] Housing | [illegible] Jobs |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A. Developer/Sponsor | | M | | | | | | | | 0 | | | | |
| Pennsauken Housing Authority and John N. D'Anastasio | Prof. | F | | | | | | | | 0 | | N/A | N/A | N/A |
| | | M | | | | | | | | 0 | | | | |
| | Other | F | | | | | | | | 0 | | | | |
| B. Advertising (Answer if different from A) | | M | | | | | | | | | | | | |
| | Prof. | F | | | | | | | | | | | | |
| | | M | | | | | | | | | | | | |
| | Other | F | | | | | | | | | | | | |
| C. Management and Sales/Rental Staff (Answer if different from A and/or B) | | M | 1 | 1 | | | | | | | | | | |
| P.R.D. Management, Inc. | Prof. | F | 1 | 1 | | | | | | | | | | |
| | | M | | | | | | | | | | | | |
| | Other | F | 1 | | 1 | | | | | | | | | |

9. STAFF INSTRUCTIONS:

Fair Housing Training: All persons engaged in the sales/rental of real property have to be instructed periodically to insure that they are aware and knowledgeable of Fair Housing requirements.

A. Are regular sales/rental staff meetings conducted? XX Yes, when? Weekly ☐ No.
If yes, is Fair Housing training provided to the sales/rental staff at that meeting? XX Yes; ☐ No.

B. If you answered "no" for either of the questions in item 9A, when is Fair Housing training provided to the sales/rental staff?
After Ground Breaking

C. Is a copy of the instructions used or proposed to be used for training sales/rental staff in Fair Housing attached to this plan? ☐ Yes X No, date when information will be submitted December 1979

D. Do the instructions include and relate to local, State and Federal Fair Housing Laws, including Executive Order 11063, the Civil Rights Act of [illegible] and this Affirmative Marketing Plan? X Yes. ☐ No; explain.

10. ADDITIONAL CONSIDERATIONS:

Other Efforts: Please describe other efforts you plan, as part of your outreach program, to attract persons in those groups that you have [illegible] least likely to apply for housing in the project under consideration, that are not covered elsewhere in this plan. Efforts to attract female headed households should be included.

In the past we have found it very difficult to attract minority senior citizens to move from their present situation to a predominately white non-family situation. The present plan is to use the County Office on Aging, The NAACP & Salvation Army to assist in this undertaking. These particular groups are most aware of minorities [illegible]

11. The applicant agrees to make any changes in a plan covering a multifamily project, which may reasonably be required, after initial [illegible] to assure continued compliance with Section 200.620 of HUD's Affirmative Fair Housing Marketing Regulations.

| FOR FHEO'S USE ONLY | | SIGNATURE OF PERSON SUBMITTING PLAN |
|---|---|---|
| APPROVAL BY: SIGNATURE [illegible signature] | DISAPPROVAL BY: SIGNATURE | [illegible signature] |
| NAME (Type or print) Robert E. [illegible] | NAME (Type or print) | NAME (Type or print) KATHLEEN M. GUARINO |
| TITLE Director FH/EO [illegible] | TITLE | TITLE AND COMPANY Vice President P. R. D. MANAGEMENT, INC. |
| DATE [illegible]-23-79 | DATE | DATE March 2, 1979 |

HUD-[illegible] (4)

PRD MANAGEMENT, INC. 523 SOUTH WHITE HORSE PIKE, AUDUBON, N.J. 08106 - (609) 546-5000

News Release

P. R. D. Management Inc. has announced that it will take applications begining ______________ from prospective tenants for the one hundred unit Pennsauken Towers Senior Citizen Building.

The project is located on Mc Clellan Ave. and is expected to be ready for occupancy July 1980. The project is specifically designed for the needs of the elderly and handocapped. Eligible persons must be 62 or over, or handicapped and their income can not exceed $10,100 for one person and $11,500 for two persons.

Monthly rents will be based upon 25% of the monthly income of the tenant and will cover the cost of utilities. The difference between what the tenant can afford, based on income and the actual cost will be paid by a grant fron the Federal Department of Housing and Urban Development.

Persons interested in applying for residency in the project may obtain an application by sending a self addredded, stamped envelope to: P. R. D. Management Inc. 523 South White Horse Pike, Audubon, N. J. 08106

**HOW DOES ONE APPLY FOR ADMISSION?**

All applications must be in writing on forms furnished by the management. The application may not be made in behalf of another person.

A single person may apply for a one-bedroom unit, but preference will be given to married couples.

All applicants must make an appointment for a personal interview with the administrator. This must be done before the applicant can be considered for an apartment.

Prior to being admitted as a resident, the applicant must be examined by a physician. This examination will be for a doctor's certificate stating the person's state of health and his ability to care for himself.

**ARE THERE ELIGIBILITY QUALIFICATIONS?**

Persons must have an income that does not exceed the Federal requirements for a single person, for a married couple, and for a related couple, per year.

Applicants must be able to care for themselves and be of such health of body and mind that they do not require special facilities or nursing care.

**DOES A RESIDENT HAVE ANY OBLIGATIONS WITH REGARD TO OTHER RESIDENTS AND THE MANAGEMENT?**

Residents are expected to make an honest effort to be agreeable to other residents and employees and to cooperate with the management in maintaining accord and harmony at all times.

**ARE THE APARTMENTS FURNISHED?**

No, residents must bring their own furnishings.

**WILL GUESTS BE FREE TO COME AND GO AS THEY PLEASE?**

Yes, just as freely as in their own homes.

**IS CLEANING SERVICE PROVIDED?**

Cleaning service is provided for the public areas only. Residents may hire maids to help clean their own apartments.

**IS THERE AN ELEVATOR IN THE BUILDING?**

Yes, the building is equipped with two elevators centrally located, serving apartments on all levels.

**IS THE BUILDING AIR-CONDITIONED?**

Only the community areas in the buildings are air-conditioned and individual apartments have sleeves for tenants own air-conditioners.

**HOW ARE THE BATHROOMS EQUIPPED?**

The bathrooms are equipped with skidproof shower and bath combinations, commode, lavatory, and specially installed grab bars.

**IS THERE A LAUNDRY ROOM?**

Yes, it is equipped with coin-operated washers and dryers.

**ARE THERE ANY HOBBY ROOMS?**

Yes, the center has a meeting room; a game room equipped with puzzles, checkers, chess, colored television, and a pool table; and a crafts and hobbies room which has a shuffle board set, woodworking tools, horse shoes, darts, and a ping-pong table.

**WHAT ENTERTAINMENT IS PROVIDED?**

Regular afternoon and evening programs such as discussion groups, bingo, films, and arts and crafts are provided. Residents are encouraged to take part in these activities.

**WHAT ARE SOME OF THE SPECIAL FACILITIES PROVIDED?**

Throughout the building are special features designed for senior citizens. These features include wall-to-wall carpeting in all corridors, lowered electrical fixtures, raised outlets to eliminate stooping, TV antenna outlets, high co-efficient sound proofing between units, modern reading or sitting areas, vending machines, and hand rails in public areas.

**MAY GIFTS BE MADE?**

A Gift Fund has been established to help meet the social and recreational needs of the residents of the Tower. The fund will be used to purchase other items which are needed.

We also hope to have our own shopping bus sometime in the not-too-distant future. Expenditures from the fund will be made by the Board members for various projects. All contributions are tax deductible.

We believe that these questions and answers cover the items of information that are most frequently requested. If a question you have is not answered above, feel free to call us.

Telephone Number: (609)-546-4844

A project of the
HHSCHC
Providing
DIGNIFIED, INDEPENDENT LIVING
FOR OUR SENIOR CITIZENS

BRENDAN T. BYRNE
*Governor*
State of New Jersey

PATRICIA Q. SHEEHAN
*Commissioner*
N.J. Department of
Community Affairs

~~[illegible]~~
~~*Executive Director*~~
~~N.J. Housing Finance Agency~~

EQUAL HOUSING OPPORTUNITY



## ...ERS TO FREQUENTLY ASKED QUESTIONS



### ...AT IS THE HADDON HEIGHTS SENIOR CITI- ...HOUSING CORPORATION?

Corporation is a PRIVATE Non-Profit ...ization sponsored by the churches of Haddon ...ts and the Municipal Government and was ...ed specifically for the purpose of building and ...ting Housing Projects for Senior Citizens Within ...orough of Haddon Heights.

### ...N WAS ROBERT C. STANFILL TOWERS ...ED?

...fall of 1977.

### ...IS ROBERT C. STANFILL?

... C. Stanfill was the motivating force behind ...fort to develop Senior Citizen Housing for the ...d Residents of Haddon Heights. Mr. Stanfill has been active in the Affairs of the Borough in both ... and private capacities including serving as an ... councilman in the Borough Government as ...s serving on many Boards and Committees for ...fit of the Borough.

### ...E BUILDING A LIFE-CARE FACILITY?

...s a retirement apartment house.

### WHAT IS THE HOME NEAR?

Basic stores, banks, and churches are within walking distance of Stanfill Tower. All stores and services are readily available by public transportation — a bus stop is near the building. A Borough mini-bus is also available which takes the residents to shopping centers every week.

### HOW MANY APARTMENTS ARE IN THE FACILITY?

One hundred and twenty-four units are located on eight floors. These will accommodate two hundred and eleven residents.

### ARE THE APARTMENTS ALL ALIKE?

No, there are two basic types: an efficiency unit with an alcove for separate living and sleeping areas, and a one bedroom unit. All of these have private bath and kitchen facilities.

### WHO MAY RENT AN APARTMENT?

Any single person or couple, 62 years of age or over or handicapped under age of 62.

### ARE THERE INCOME LIMITATIONS?

Yes. One person — $9,000/yr.; Couple — $10,300/yr.

### DO THE INCOME LIMITS INCLUDE SOCIAL SECURITY PAYMENTS?

The income limits include all sources of income.

### IS THERE ANY LIMITATION ON ASSETS A PERSON MAY HAVE?

There is no limitation on assets a person may have.

### HOW MUCH IS THE MONTHLY RENT?

Eligible individuals or couples pay 25% of their monthly income as rent. The remaining difference between what they can pay and the real rent is made up by a payment from the federal government under a special program set up for this purpose.

### ARE THE UTILITIES INCLUDED IN THE MONTHLY RENTAL CHARGE?

Yes — all utilities except telephone are included in the monthly rental charge.

In addition to the first month's rent, a resident must pay a month security deposit. The security deposit will be returned including interest earned — less 1% when the resident moves, provided the apartment is in good condition.




ONE BEDROOM UNIT




EFFICIENCY UNIT

ALL DIMENSIONS ARE APPROXIMATE
(WE WILL SUPPLY DIMENSIONS FOR FLOOR PLANS)

BOARD OF TRUSTEES
Haddon Heights Senior Citizen Corp.

Harry B. Antell
Temple Beth Sholom
of Haddon Heights

Alfred F. De Martini
Member at Large

Jerome O. Evaul, Sr.
First United Methodist Church
of Haddon Heights

George A. Johnson
Ascension Lutheran Church
of Haddon Heights

Donald D. Lyford
First Presbyterian Church
of Haddon Heights

Edward H. Maguire
Bethany Presbyterian Church
of Haddon Heights

Gerald R. Minchin
St. Mary's Episcopal Church

Robert C. Stanfill, Sr.
Forever Young Club
(Senior Citizens)

Harry W. Vincent
St. Rose of Lima
R. C. Church

Dennis J. O'Brien, Esq.
Solicitor

James M. McGrath
Housing Consultant

Managed by:
P. R. D. Management Inc.
523 S. White Horse Pike
Audubon, N.J. 08106

HOUSING ASSISTANCE PAYMENTS CONTRACT

EXHIBIT E

DAILY DEBT SERVICE SCHEDULE
NJ16-0029-001

| Bedroom Size | Number of Units | Daily Debt Service |
|---|---|---|
| 1 | 100 | $11.97 |