Westlaw.


Mitchell v. U.S.
Cl.Ct.,1986.

United States Claims Court.
Helen MITCHELL, et al., Plaintiffs,
v.
The UNITED STATES, Defendant.
**Nos. 772-71, 773-71, 774-71 and 775-71.**

May 22, 1986.

Indian allottees brought action against Government for alleged mishandling of timber sales on allotted land. Government motion for summary judgment, Claims Court, Wiese, J., held that: (1) Indians had actual and constructive knowledge by at least 1955 of the their claims; (2) bar of the statute of limitations could not be avoided on theory that the underlying wrong was a continuing wrong; (3) bar of the statute of limitations could not be avoided on the theory that there was only a single comprehensive undertaking which did not give rise to suit until completion of the last contract; but (4) each sale of timber at allegedly inadequate price in each failure to insure regeneration after harvesting gave rise to a separate cause of action as to which the statute of limitations began to run at the time of sale or harvest.

Motion granted.

Opinion modified in part, Cl.Ct. 787.

West Headnotes

**[1] Federal Courts 170B 1104**

170B Federal Courts
170BXII Claims Court (Formerly Court of Claims)
170BXII(B) Procedure
170Bk1103 Time to Sue and Limitations
170Bk1104 k. In General; Laches. Most Cited Cases
Statute of limitations on claims against the United States is jurisdictional so that claims defined by events which occurred more than six years prior to the commencement of the suit are beyond the court's power to hear and decide. 28 U.S.C.A. § 2501.

**[2] Limitation of Actions 241 95(2)**

241 Limitation of Actions
241II Computation of Period of Limitation
241II(F) Ignorance, Mistake, Trust, Fraud, and Concealment or Discovery of Cause of Action
241k95 Ignorance of Cause of Action
241k95(2) k. Want of Diligence by One Entitled to Sue. Most Cited Cases
(Formerly 241k95(1))

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

**Limitation of Actions 241 104(1)**

241 Limitation of Actions
241II Computation of Period of Limitation
241II(F) Ignorance, Mistake, Trust, Fraud, and Concealment or Discovery of Cause of Action
241k104 Concealment of Cause of Action
241k104(1) k. In General. Most Cited Cases

Where due diligence would not have prompted discovery of the wrong, as in cases where the wrong has been fraudulently or deliberately concealed or where the fact of injury is inherently unknowable, equitable considerations dictate that the running of the statute of limitations be suspended.

**[3] Federal Courts 170B 1105**

170B Federal Courts
170BXII Claims Court (Formerly Court of Claims)
170BXII(B) Procedure
170Bk1103 Time to Sue and Limitations
170Bk1105 k. Particular Claims. Most Cited Cases

Statute of limitations on claims of Indians against the Government for improper handling of timber sales on allotted land barred those claims despite Indians' assertions that their claims were inherently unknowable because they involved complex subject matter requiring expert knowledge. 28 U.S.C.A. § 2501.

**[4] Limitation of Actions 241 95(1)**

241 Limitation of Actions
241II Computation of Period of Limitation
241II(F) Ignorance, Mistake, Trust, Fraud, and Concealment or Discovery of Cause of Action
241k95 Ignorance of Cause of Action
241k95(1) k. In General; What Constitutes Discovery. Most Cited Cases

Knowledge of a cause of action sufficient to trigger the running of the statute of limitations may be as much a matter of constructive notice as of actual notice.

**[5] Limitation of Actions 241 95(1)**

241 Limitation of Actions
241II Computation of Period of Limitation
241II(F) Ignorance, Mistake, Trust, Fraud, and Concealment or Discovery of Cause of Action
241k95 Ignorance of Cause of Action
241k95(1) k. In General; What Constitutes Discovery. Most Cited Cases

Existence of a trust relationship does not preclude the statute of limitations from beginning to run when plaintiff has actual or constructive notice of the claim, although the threshold for inquiry may be higher in the case of a trust relationship.

**[6] Federal Courts 170B 1107**

170B Federal Courts
170BXII Claims Court (Formerly Court of Claims)

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

170BXII(B) Procedure
170Bk1103 Time to Sue and Limitations
170Bk1107 k. Accrual of Claims; Continuing Claims. Most Cited Cases

Statute of limitations on claims of Indian allottees against Government for alleged mishandling of timber sales began to run at least in 1955 when congressional hearings were held concerning the allegations, thus giving the Indians at least constructive notice of their claims against the Government. 28 U.S.C.A. § 2501.

**[7] Federal Courts 170B ⚷1105**

170B Federal Courts
170BXII Claims Court (Formerly Court of Claims)
170BXII(B) Procedure
170Bk1103 Time to Sue and Limitations
170Bk1105 k. Particular Claims. Most Cited Cases

Claims of Indian allottees against Government for alleged mishandling of timber sales on allotted land were not based on a continuing wrong so as to allow allottees to avoid bar of the statute of limitations. 28 U.S.C.A. § 2501.

**[8] Federal Courts 170B ⚷1106**

170B Federal Courts
170BXII Claims Court (Formerly Court of Claims)
170BXII(B) Procedure
170Bk1103 Time to Sue and Limitations
170Bk1106 k. Computation of Limitations in General. Most Cited Cases

Even if logging contracts involving allotted land were viewed as a single, comprehensive undertaking, running of the statute of limitations on allottees' claims against the Government for alleged mishandling of the contracts would not be postponed until the completion of the last contract. 28 U.S.C.A. § 2501.

**[9] Federal Courts 170B ⚷1107**

170B Federal Courts
170BXII Claims Court (Formerly Court of Claims)
170BXII(B) Procedure
170Bk1103 Time to Sue and Limitations
170Bk1107 k. Accrual of Claims; Continuing Claims. Most Cited Cases

Each sale of a portion of timber on allotted land generated a new and separate cause of action in favor of the allottee against the Government for alleged mishandling of the timber sales and statute of limitations began to run on each claim at that time. 28 U.S.C.A. § 2501.

**[10] Federal Courts 170B ⚷1107**

170B Federal Courts
170BXII Claims Court (Formerly Court of Claims)
170BXII(B) Procedure
170Bk1103 Time to Sue and Limitations
170Bk1107 k. Accrual of Claims; Continuing Claims. Most Cited Cases

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Each harvesting of trees on allotted land generated a new cause of action in favor of allottees against Government for allegedly failing to fulfill its duty to insure regeneration on land in question and statute of limitations on those claims began to run with each harvesting. 28 U.S.C.A. § 2501.

***64** Charles A. Hobbs, for plaintiffs; Jerry C. Straus, Marsha Kostura, and Hobbs, Straus, Dean & Wilder, of counsel.
Edward J. Passarelli, with whom was Asst. Atty. Gen., F. Henry Habicht, II, for ***65** defendant; Arthur Biggs and Richard De Clerck, Department of the Interior, Portland, Or., of counsel.

OPINION

WIESE, Judge.
The plaintiffs in these consolidated actions are allottees of land located on the Quinault Reservation. As here assembled, this group includes approximately 1,500 individuals (in each of the consolidated actions), the Quinault Tribe, and the Quinault Allottees Association, an unincorporated association organized in early 1968 to promote the interests of the allottees of the Quinault Reservation. Their claims, first filed in the former United States Court of Claims more than fifteen years ago, seek damages based on allegations of mismanagement by the Government in its role as trustee of the plaintiffs' timber resources and related property interests.

The litigation has been the subject of a number of decisions by the Court of Claims as well as the Supreme Court FN1 and the end is not yet in sight. Currently the court has before it defendant's motion to dismiss, on grounds of lack of timeliness, that portion of plaintiffs' claims involving events occurring prior to October 1965, *i.e.*, more than six years prior to the commencement of the actions. Plaintiffs oppose the motion, contending that the timeliness of their suits presents genuine issues of material fact the resolution of which necessarily demands that a trial be held. After consideration of the parties' extensive documentary submissions, their recitations of fact and briefs on the law, and the further elaboration of their positions during oral argument, the court has concluded that the motion for partial summary judgment should be granted. The court's views on the matter, expressed at the conclusion of the oral argument, are set forth herein in more detail.

FN1. The judicial history of the present litigation is to be found in the following reported decisions: *Quinault Allottee Association v. United States,* 197 Ct.Cl. 134, 453 F.2d 1272 (1972) (authorizing suit to proceed in the nature of a class action); *Quinault Allottee Association v. United States,* 202 Ct.Cl. 625, 485 F.2d 1391 (1973) (upholding Government's right to deduct administrative fees from the sale proceeds of the allottees' timber); *Mitchell v. United States,* 219 Ct.Cl. 95, 591 F.2d 1300 (1979) (holding the Government open to suit for breach of trust pursuant to the Indian General Allotment Act, 25 U.S.C. §§ 331-358 (1982)); *United States v. Mitchell,* 445 U.S. 535, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980) (reversing the Court of Claims 1979 decision and remanding for further consideration with respect to plaintiffs' remaining jurisdictional grounds for obtaining monetary relief from the United States); *Mitchell v. United States,* 229 Ct.Cl. 1, 664 F.2d 265 (1981) (holding the United States subject to suit for monetary relief for breach of trust pursuant to various timber management statutes); *United States v. Mitchell,* 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (affirming the Court of Claims 1981 decision).

I.

The Quinault Reservation was established by Executive Order in 1873 pursuant to a Treaty between the United

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

States and the Quinault and Quileute Indians. Treaty of Olympia, July 1, 1855, 12 Stat. 971. Between 1905 and 1935, the entire Reservation was allotted to individual Indians pursuant to the Indian General Allotment Act of 1887, 25 U.S.C. §§ 331-358 (1982).

The Reservation lands comprise approximately 200,000 acres, most of which are heavily forested. Management of this vast timber resource is entrusted to the Secretary of the Interior: various federal statutes assign to him the responsibility of arranging for the sale of the allottees' timber, providing for distribution of the sale proceeds to the individual allottees, and insuring the continuity of the forest and the income therefrom through adherence to principles of sustained yield. The plaintiffs' grievances lie in the manner in which the Secretary has discharged these duties.

To explain: the Bureau of Indian Affairs ("BIA") began logging the Indians' timber under long-term logging contracts in 1920. From that date through 1957, there were 12 contracts that covered logging on the southern half of the Reservation. On the northern half of the Reservation logging ***66** was completed over the period 1950 through 1986-this under two contracts covering the areas known as the Taholah and Crane Creek Units. Plaintiffs' contend that the Secretary mismanaged these logging contracts in several respects. Their specific claims are the following:

(1) Stumpage Claim-Plaintiffs charge that the Secretary, though obliged to do so, failed to obtain fair market value for the timber that was sold over the period 1920 to current date. They say that the inadequate value which they received was due to the fact that the contracts' initial prices were set too low, that adjustments in those prices over the contracts' terms consistently lagged behind the corresponding changes in market prices, and, finally, that the loggers were allowed costs (offsets to the log prices) that were excessive and/or improper.

(2) High-Grading Claim [FN2]-The Taholah and Crane Creek contracts contemplated that the logger was to pay a price based upon the average grade of the timber as it stood prior to the start of logging. Since the average grade of each species in each unit was not known in advance, the BIA estimated the grades for purposes of determining stumpage prices. In the early years of the Taholah and Crane Creek Contracts (1950-1956), the loggers were cutting the better grade timber and paying, as the contracts contemplated, an average price per species. This practice, known as "high-grading", was not prohibited by the contracts. Viewed in the context of a long-term contract, the practice was not harmful to the allottees for, in the contracts' later stages, the allottees could expect to receive an average price for below-average timber. Plaintiffs' claims arise out of the fact that, in 1964, the BIA switched from the concept of payment based upon an estimated unit-wide average grade per species to payment based upon average actual grades as reflected in then-current timber harvests. This switch, say plaintiffs, worked to the loggers great advantage because they enjoyed the early benefits of high-grading while escaping the corresponding downside of the harvest cycle when the average price would exceed the average grade.

FN2. The High-Grading claim is applicable only to the Taholah and Crane Creek contracts.

(3) Pick-up Scale Claim [FN3]-Among the BIA's responsibilities under the logging contracts was the duty to insure that the logger had removed all merchantable timber from the harvest site. The BIA was to scale (*i.e.*, measure) any timber left behind and charge its value to the logger. Plaintiffs claim that the BIA was deficient in the performance of this duty with the result that much merchantable timber remained on site for which the allottees never received payment.

FN3. The Pick-Up Scale Claim relates only to the Taholah and Crane Creek contracts and only for the years 1950-1977.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

(4) Regeneration Claim-As noted, the Secretary has a statutory duty to manage the Quinault Reservation timber on a sustained yield basis. 25 U.S.C. §§ 406(a), 466 (1982). Plaintiffs charge that, contrary to the requirements of sound forestry practices, the Secretary failed to introduce artificial regeneration (through seeding or planting) on thousands of acres of cut-over land whose natural regrowth had been destroyed or hindered either by fire or by excessive accumulation of slash (*i.e.,* cutting debris). As a result of these alleged failures to promote timely regeneration, plaintiffs claim that many areas in both halves of the Reservation remain inadequately restocked to this day and perhaps may never recover from the mismanagement that has occurred.

It is evident from this brief identification of the claims in question that much of what is being complained about involves acts and omissions on the part of the BIA that occurred more than six years prior to the initiation of the litigation. It is on that ground that the Government now moves for dismissal. As noted, plaintiffs oppose for reasons that we come to shortly.

II.

[1] Title 28 of the United States Code provides that every claim over which the ***67** United States Claims Court has jurisdiction shall be barred "unless the petition thereon is filed within six years after such claim first accrues". 28 U.S.C. § 2501 (1982). In the traditional formulation of the accrual rule, a claim is said to first accrue when "all events" have transpired that "fix the Government's alleged liability, entitling the claimant to demand payment and sue here for his money." *Nager Electric Co. v. United States,* 177 Ct.Cl. 234, 240, 368 F.2d 847, 851 (1966) (footnote omitted). And inasmuch as the statute of limitations is jurisdictional, *Soriano v. United States,* 352 U.S. 270, 273, 77 S.Ct. 269, 271, 1 L.Ed.2d 306 (1957), claims defined by events that occurred more than six years prior to the commencement of suit here would be beyond the court's power to hear and decide.

[2] The rationale that underlies the "all events" test is the view that an individual is expected to act with reasonable diligence in the protection of his interests and will therefore become aware of acts of another that invade or injure those interests. The corollary of this proposition is that where due diligence would not have prompted discovery, as in cases where the wrong has been fraudulently or deliberately concealed or where the fact of injury is inherently unknowable, then equitable considerations dictate that the running of the statute of limitations be suspended. *Bailey v. Glover,* 88 U.S. (21 Wall.) 342, 22 L.Ed. 636 (1874); *Urie v. Thompson,* 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949).

(A)

It is this last-expressed idea-that of injury remaining unknown despite the exercise of diligence-that identifies the first of the two basic propositions upon which the plaintiffs rest their opposition to the Government's motion for summary judgment. Plaintiffs argue the point in a number of ways.

They say, first, that their relationship with the Government is one of express trust, a circumstance which they contend bears heavily on the degree of diligence they might reasonably have been expected to exercise. In other words, as a matter of everyday expectation, they had a right to assume that the Government was properly discharging its trust responsibilities. Second, plaintiffs invoke a rule of general trust law that says that where a fiduciary or other confidential relationship exists, a trustee's failure to disclose acts of mismanagement amounts to active concealment of those facts. They argue that the flow of information from the Government to the allottees was, at best, a meager disclosure and never sufficient to have permitted them to determine for themselves wheth-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

er their timber was being sold for a fair price or whether regeneration was adequate and of the proper species.

Finally, plaintiffs contend that their claims were “inherently unknowable” meaning, in their usage of that term, that stumpage values and regeneration requirements involved complex subject matters (the former particularly so because of the intricate price adjustment mechanics of the BIA contracts), an understanding of which demanded expert knowledge. Their point then is that recognition of the existence of claims required knowledge of which they were excusably ignorant. In substance, what all three positions come down to is that plaintiffs neither knew nor had reason to know that their affairs were being ill-administered by the Government and therefore, the statute of limitations should not bar their right to now proceed.

(1)

[3][4] Neither the facts nor the law applicable to those facts favor plaintiffs' arguments. We start with the proposition that the law does not insist that one be certain of the existence of a course of action before the statute of limitations may commence running. Rather, reasonable diligence in the protection of one's interests dictates that where there is reason to suspect there is reason to inquire and, therefore, “ ‘[w]hatever is notice enough to excite attention and put the party on his guard and call for inquiry, is [also] notice ***68** of everything to which such inquiry might have led.’ ” *Wood v. Carpenter,* 101 U.S. (11 Otto) 135, 141, 25 L.Ed. 807 (1879) (quoting the early English Chancery case, *Kennedy v. Greene,* 3 Myl. & K. 722). Knowledge of a cause of action sufficient to trigger the running of the statute of limitations may, therefore, be as much a matter of constructive notice as of actual notice. Moreover, facts demanding further action are not just those that reveal the existence of a cause of action with certainty. Even rumors or vague charges may demand pursuit “if of sufficient substance to arouse suspicion.” *Tobacco and Allied Stocks, Inc. v. Transamerica Corp.,* 143 F.Supp. 323, 331 (D.Del.1956), *aff'd,*244 F.2d 902 (3d Cir.1957).

[5] The existence of a trust relationship does not call for the application of a different rule. True, given the confidence and trust that normally attends a fiduciary relationship, the threshold for inquiry may be higher, *Daniel v. International Brotherhood of Teamsters,* 410 F.Supp. 541, 545 (N.D.Ill.1976), *aff'd,*561 F.2d 1223 (7th Cir.1977), *rev'd on other grounds,*439 U.S. 551, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979), but suspicion once aroused may not be ignored. Thus the Indian beneficiary of a trust, no less than any other, is charged with notice of whatever facts an inquiry appropriate to the circumstances would have uncovered. *Menominee Tribe of Indians v. United States,* 726 F.2d 718, 721 (Fed.Cir.1984), *cert. denied,*469 U.S. 826, 105 S.Ct. 106, 83 L.Ed.2d 50 (1984).

(2)

[6] Applying the foregoing principles to the facts of this case yields one certain conclusion: plaintiffs had reason to know of their causes of action long before the date their suits were finally brought. The basis for this conclusion starts with the fact that dissatisfaction with the prices the BIA received for the Quinault Reservation timber was a fact of life for some allottees, at least as early as 1955-some sixteen years prior to the commencement of litigation in the Court of Claims.

It was in that year that a congressional joint committee commenced a series of hearings in various Pacific Northwest communities to investigate federal timber sale policies. In that connection hearings were held in Aberdeen, Washington, a community adjacent to the Quinault Reservation, on November 28, 1955. *See Federal Timber*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*Sale Policies: Joint Hearings Before a Special Subcomm. on the Legislative Oversight Function of the Senate Comm. on Interior and Insular Affairs and the Subcomm. on Public Works and Resources of the House Comm. on Government Operations,* Parts 1 and 2, 84th Cong., 1st and 2d Sess. (1955).

The common view among the several who spoke in behalf of the Indians on this occasion was that Indian-owned timber, including that on the Quinault Reservation, was being sold by the BIA at less than the going market value. Individuals expressing these thoughts included Richard L. Neuberger, the United States Senator from Oregon, *id.* at 1315, 1590, 1723; Bruce A. Bishop, representative of the International Woodworkers of America (CIO), *id.* at 1611-12; and one Claude Wain, an allottee of the Quinault Reservation who appeared before the committee on behalf of 1,200 members of the Chinook Tribe, whose total membership owned approximately 70 percent of the Reservation's timber. Mr. Wain's comments included the following, concerning the pricing of Indian timber:

However, even in these [local] area sales it is a known fact that you could cross the road there from the [Quinault] Indian reservation on to [adjacent] Olympic National Forest land and still the National Forest Service obtains higher prices for their timber than the Indian does, which only requires crossing the road. [*Id.* at 1635.]

The sense of inadequate prices for the Quinault Reservation timber was not confined simply to comments before the congressional committee. The Tribal Council of the Quinault Reservation also shared this view, as is evident in a response it submitted to the BIA on September 15, ***69** 1955 concerning a proposed pricing adjustment in certain logging contracts. In declining to take a position on the issue, the Council wrote:

At no time during the negotiations for letting of these logging contracts on the units involved, were the tribal authorities or the individuals concerned offered a full and free opportunity to obtain *what was felt to be more favorable terms, conditions and stumpage prices,* it was a situation where, the individuals and the tribe had to elect to accept all the terms and conditions imposed by the Department in order that timber logging contracts could be made and the owners might sell their timber. [Emphasis added.]

Nor were these various expressions of disapproval of BIA stumpage prices the province of the knowledgeable few. Both before and during the congressional hearings, the matter of Indian timber pricing gained substantial press attention. For example, on June 24, 1955, the Seattle Post Intelligencer and the Aberdeen Daily World ran articles noting Senator Neuberger's call for a congressional inquiry “to find out why hemlock timber on the Quinault Indian Reservation in Washington is being sold ‘at absurdly low prices'.” Again, on August 17, 1955, the Seattle Post Intelligencer reported the scheduling of a Senate subcommittee hearing at Grays Harbor, Washington, on November 22, 1955 to investigate “[p]rices paid to Indians for timberlands in the Quinault Reservation” to determine whether “Indians receive less for their timber than Caucasians do on adjacent tracts.” And on November 29, 1955, both the Seattle Post Intelligencer and the Aberdeen Daily World gave extensive coverage to the prior day's congressional timber hearings noting, in their respective accounts, the charge that had been made by the CIO that “ ‘[t]he Indian not only gets skinned on his [stumpage] price but gets shorted on his [log] scale as well.’ ”

Based upon the information gathered by the congressional committee, a report was prepared setting forth findings, conclusions, and recommendations. In section F of this report, titled “Special Indian Problems”, the committee noted the particular problems associated with the BIA's management of the Quinault Reservation. The section concluded with the following observation:

The result of all these factors is that existing prices on the Quinaielt [alternate spelling] Indian Reservation are

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

today substantially below prices paid for comparable Federal timber in the same area.

The committee finds that the continuance of these practices could constitute a serious breach of trust by the Federal Government in its relations with these Indian beneficiaries. *Federal Timber Sales Policies: Thirty-First Intermediate Report of the Committee on Government Operations,*H.R.Rep. No. 2960, 84th Cong., 2d Sess. 16 (1956).

Within a year of the issuance of this report, federal timber sales policies on the Quinault Reservation again came under congressional scrutiny. News of this follow-up hearing was reported in the Aberdeen Daily World on April 4, 1957, under the caption “Indian Timber Prices Hearing Opens April 11”. Announcement of the hearing was made by Senator Henry M. Jackson who noted that the “ ‘matter of low prices Indians have been receiving for their timber’ ” had been under congressional study for some time.

The hearings, which convened in Washington, D.C., on April 11, 1957, heard testimony from several sources, including a brief statement from Senator Jackson in whose State (Washington) the Quinault Reservation was located. Senator Jackson's comments included these remarks:

As you know, I have been concerned for some time over the lack of satisfaction with the management of Indian timber sales on the Quinault Reservation by the Bureau of Indian Affairs.

In fact, I was present on behalf of the Indians at one of the earliest hearings at which protests were raised several years ago.

***70** I believe that was about 1950 or 1951. Your hearings of late 1955 and early 1956 were replete with testimony from the Indians themselves and interested persons as to the failure of the Bureau of Indian Affairs to manage the sale of the Indian timber, so as to return the highest possible profit to the Indian owner.

I think it appears in the record * * * that other contracts under somewhat similar circumstances give the owners a better return. I think this is really the heart of the whole matter. *Timber Sales: Quinaielt Indian Reservation, Hearings Before the Subcomm. on Indian Affairs of the Senate Comm. on Interior and Insular Affairs,* 85th Cong., 1st Sess. 64 (1957).

A similar note of disapproval was sounded by Malcolm McLeod, a Seattle, Washington attorney who appeared before the committee in behalf of a number of off-Reservation allottees. Mr. McLeod expressed an across-the-board disapproval of the two ongoing logging contracts (Taholah and Crane Creek). He told the committee that the contracts were not in the Indians' best interests: “Now, I see these Indians, I know them personally. They come into my office regularly and complain. Many of them are in the most dire straits of poverty and they still own several thousand dollars' allotments, but they are unable to get the money for them.” *Id.* at 72. Further, it was his view that the contracts should be canceled “and that the United States as trustee for these Indians * * * be held liable for damages for breach of trust because that is clearly, purely, and simply, what it is.” *Id.* at 72.

The hearings concluded and recommendations were made. But expected reforms by the BIA were not forthcoming, and discontent did not abate. One allottee wrote Senator Warren G. Magnuson on September 22, 1958, expressing his concern about the BIA's lack of corrective action in these terms:

I, along with several thousand Indians allotted on the Quinault Reservation were greatly encouraged by hearings conducted in 1956-57 by the Senate Committee on Interior Affairs. We believed that at long last our voices were

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

being heard in Washington. We had great confidence in our Democratic Senators Jackson, Magnuson, Murray, and Neuberger. But what has happened? Some fine recommendations were made by this Committee. What action was taken to pass legislation to enforce them? What controls were established over the Bureau of Indian Affairs? What action was taken by the Attorney General's Office to correct the injustices of the past?

Efforts to right the sense of wrong went beyond the level of individual complaint. Some allottees, encouraged by congressional recommendations urging the formation of advisory boards to work with the BIA, organized a starting committee known as the Interim Advisory Committee of the Resource Development Association of the Quinault Reservation. This committee, reacting to what it saw as continued indifference on the part of BIA to securing appropriate price adjustments on the logging contracts, issued a newsletter directed to the attention of all allottees. That newsletter, dated May 1958, read (in original text) in part as follows:

In cutting the stumpage rate by $1.00 to $10.00 per thousand, so they can make a larger profet, or better working conditions for ther men, they will do so with the help of the bureau of indian affairs', even though it means you will lose your'e rightfull share of stumpage. By so denining you, you may not be able topay your'e bill's, buy or build a new home, buy new clothes, a car or truck, or pay for your'e medical or dental expences. The older people, who are unable to work will be unable to meet and maintain the higher cost of living that now exest; due to this lower stumpage rate.

It is up to you, the Indian allottee of this reservation to help us break this white colard monoply, and help us cut this BUREAUCRATIC red tape that the two [logging] companys are strangling ***71** with us now. You can do this by (1) comming to our meetings or wrighting in and giving us a vote of confidence (2) Or mainly by writing to your senator or congressman and tell him we the Indian are being rob & cheated of 2/3 of our timber wealth. * * * FN4

FN4. Plaintiffs made the point in their briefs and during oral argument that there is no proof that the quoted newsletter was ever distributed to the allottees. Accepting that fact as true, it is, nevertheless, not a critical point. The significance of the newsletter lies as much in the collective state of mind that it mirrors as it does in the collective action that it hoped to engender. Non-distribution of the newsletter would not alter the fact that among the diligent, at least, the time had come to take action against the BIA.

(3)

Though there is more that could be added to the facts we have stated, enough has been said to this juncture to require a conclusion in the Government's favor. Regardless of the degree of diligence one might deem appropriate to plaintiffs' circumstances, the facts leave it certain that the Quinault allottees, individually and as a group, knew or had reason to know of the Government's alleged mismanagement of their timber resources, at least as to the basic matter of the pricing of the timber, years before their suits were finally brought. Certainly by, say, mid-1958, enough words had been aired to have brought home to even the most unsophisticated among them an awareness that perhaps not all was right in the Government's management of the Reservation timber. Further action was then clearly called for-the hiring of a lawyer, for example-and from that event one can assume would have followed what eventually did come about (though not until many years later) namely, the revelations that are the content of the present suits. In short, regardless of the theory of the case one might pursue, whether that be express trust, fraudulent concealment or inherent unknowability, there is no legally acceptable basis for excusing the lack of timely pursuit of rights.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

The argument is made that even if the court should decide that the stumpage claim is barred in part on grounds of notice and lack of timeliness, nevertheless, the remaining claims may survive in their entirety for of them little was said during the congressional hearings. There are two answers to this contention. First, with respect to the high-grading,[FN5] pickup scale and cost allowances claims, all involve factual matters that have a direct and immediate bearing upon the amount of money the allottees received for the timber that has been cut; hence, we think an awareness of these claims is the logical outgrowth of an investigation of stumpage prices in general.

FN5. As was pointed out earlier, the facts comprising the high-grading claim did not occur until the change-over in BIA pricing policy in 1964. Consequently, any suit commenced prior to that time would not have included this issue. However, we can reasonably assume that litigation focusing on the general subject of stumpage values under the long-term logging contracts would have sensitized the plaintiffs to the potential claim significance inherent in the BIA's switch in pricing policy. The high-grading claim, in other words, would have been uncovered by plaintiffs as soon as the facts were there to be discovered. We therefore hold that the high-grading claim accrued as of the time the events in question took place.

Second, as regards the regeneration claim, it is true that, unlike stumpage values, this was not a subject of much discussion. At the same time, however, the subject of regeneration did not escape congressional attention. Significant among the several observations directed to this subject was a comprehensive written report prepared by a forestry consultant at the behest of the Senate investigating committee. This report, reprinted in full in the transcript of the 1957 hearings, reads in part as follows:

The wide variations in acreage cut each year indicate that it will subsequently be difficult in the next rotation to obtain an equal annual harvest. This is confirmed by a Bureau of Indian Affairs management plan for the reservation. The problem has been compounded ***72** by the fact that 22,400 acres of the 60,000 acres cut over to date has been burned and, in some cases, 2 or 3 fires have swept the same area. The later fires had the effect of setting back regeneration. In addition, cutting was also very heavy, in the 1922-30 period. The result is that the age class distribution needed for a stable balanced sustained yield cut cannot be attained for the second rotation.

Further, while the original reservation contained over 50 percent cedar the cutting and regeneration pattern and the rotation planned will convert the stand to a hemlock pulp producing rotation. The Bureau of Indian Affairs believed that pulp production would produce the best income for the owners.

From an income-producing standpoint many of the allotments are in no better shape now than they were originally. Where at first their problem was isolation due to lack of roads, it now is that many of the more accessible allotments do not have a satisfactory stocking to produce a timber crop. [*Timber Sales-Quinaielt Indian Reservation: Hearings Before the Subcomm. on Indian Affairs of the Senate Comm. on Interior and Insular Affairs,* 85th Cong., 1st Sess. 289 (1957).]

As the court sees this case, any investigation of plaintiffs' stumpage claims would have taken the foregoing consultant's report into account, and, considering the passage quoted, that report would certainly have triggered concern about the adequacy of regeneration on the Quinault Reservation.

Any doubt that might remain on this score can only be resolved in the Government's favor given that in February 1962 (some nine years before plaintiffs' actions commenced) the BIA issued its quarterly “Quinault Newsletter” in which it advised the allottees as follows concerning forest regeneration:

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Reproduction surveys have just been completed on the cut-over blocks on the Crane Creek and Taholah Units. This survey showed that approximately 88 percent of the 1,488 cut-over acres sampled on the Crane Creek and 78 percent of the 2,600 acres on the Taholah Unit would benefit by some means of artificial regeneration, seeding or planting. Allottees interested in obtaining information on seeding or planting their cut-over allotments should contact one of the agency offices at Hoquiam or Everett and ask about applying for Federal Cost-Sharing Benefits under the Agricultural Conservation Program for planting and seeding forest land.

Based on the factual considerations mentioned here, it must be concluded that plaintiffs knew enough to have commenced investigation and formally challenged the BIA's timber sale practices and policies by 1958. An investigation commenced then would have led to an uncovering of the various facts and considerations that now make up their various mismanagement claims. Knowledge sufficient to warrant the pursuit of litigation was constructively available to the allottees more than six years prior to their appearances in this court. It follows, therefore, that, to the extent plaintiffs allege justifiable ignorance of the Governmental acts of misfeasance and nonfeasance occurring outside of the six-year limitations period (*i.e.*, prior to October 19, 1965) as the reason for their delayed assertion of claims, they cannot succeed. Excusable ignorance as a basis for permitting a tolling of limitations has not been shown.

(B)

In addition to the theories discussed above, plaintiffs raise another argument that proceeds along entirely different lines. Each of the aforementioned theories would have allowed a tolling of the statute of limitations had plaintiffs shown themselves to be justifiably ignorant of their causes of action. But, as noted, those arguments failed here in light of plaintiffs' constructive knowledge of their claims for mismanagement. Such knowledge, however, is irrelevant***73** to plaintiffs' final argument; hence, this separate discussion.

The last of plaintiffs' tolling arguments is the “continuing wrong” theory. Although there is no precedent for its use in this circuit, courts in other jurisdictions have applied the continuing wrong theory in instances in which the defendant's conduct consisted not of one discrete wrongful act, but of an ongoing series of acts no single incident of which could “ ‘fairly or realistically be identified as the cause of significant harm’ ”. *Page v. United States*, 729 F.2d 818, 822 (D.C.Cir.1984) (quoting *Fowkes v. Pennsylvania Railroad Co.*, 264 F.2d 397, 399 (3d Cir.1959)).

The tolling rule which the courts have endorsed in these circumstances is that “the statute of limitations does not begin to run * * * till the wrong is over and done with * * *.” *Taylor v. Meirick*, 712 F.2d 1112, 1118 (7th Cir.1983). The general rule goes on to say that where a continuing wrong is found, a plaintiff can “reach back and get damages for the entire duration of the alleged violation.” *Id.* at 1119. Further, the continuing wrong theory is not restricted simply to situations where a claimant may be unaware of a mounting injury as in, say, a case involving injurious drug treatment where the harm that occurs is caused over a period of time rather than at a single point in time. Rather, in the view of some courts, the continuing wrong theory dictates that the statute of limitations remains tolled until the last of the injurious acts takes place even though the plaintiff has knowledge of the injurious character of the defendant's actions. *Gross v. United States*, 676 F.2d 295, 300 (8th Cir.1982).

Plaintiffs cite to the court several cases illustrating these principles. For example, in *Taylor v. Meirick*, 712 F.2d at 1119, the court found a continuing wrong in defendant's repeated unauthorized copying and sale of plaintiff's copyrighted maps. The court observed that the statute of limitations did not commence running until the last of the infringing copies was sold either by the defendant or with his connivance. *Id.* at 1118-19. The court further

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

held that the plaintiff could recover damages dating from the first acts of infringement, even though they had occurred more than three years (the relevant limitations period) before plaintiff filed suit. *Id.*

The court in *Page v. United States,* 729 F.2d 818 (D.C.Cir.1984), used a similar approach. The plaintiff in that case, an army veteran, sued in 1981 claiming the Veterans Administration (VA) had subjected him to improper drug treatment from 1961 to 1980. The court characterized the VA's conduct as a continuing tort, and ruled that the statute of limitations did not commence until the treatment ended in 1980. *Id.* at 822-23. A prior lawsuit brought by plaintiff on the same grounds in 1972 precluded his recovery of pre-1972 damages on grounds of res judicata, but the court concluded that plaintiff could seek damages for the treatment that continued thereafter during the 1972-1980 period. *Id.* at 821-23. On the matter of notice, the court said that “Page's awareness since at least 1972 of his addiction and the attendant harm does not defeat application of the continuing-tort doctrine since its very purpose would be to deny VA an open-ended license to continue the drug program that assertedly caused and maintained Page's addiction.” *Id.* at 823 (footnotes omitted).

Still another case that reflects use of the continuing wrong rationale is *Baker v. F & F Investment,* 420 F.2d 1191 (7th Cir.), *cert. denied,*400 U.S. 821, 91 S.Ct. 40, 27 L.Ed.2d 49 (1970). Here the plaintiffs, a group of black homeowners, brought suit under the Civil Rights Act of 1866, 42 U.S.C. § 1982 (1982), alleging that their installment contracts with defendant for the purchase of residential real estate incorporated terms less favorable than like contracts executed with white home purchasers.

In denominating the injury suffered as a continuing wrong, the court in *Baker* explained that “the touchstone of our inquiry must be the nature and extent of defendant's behavior, not the duration of plaintiff's injury.” *Id.* at 1200. The court then ***74** went on to say that the defendants had entered into a series of contracts with the plaintiffs which became the basis of an ongoing relationship with them, and, at the same time, amounted to “a prolonged and continuing invasion of the rights of the purchasers.” *Id.* at 1200. It was therefore held that, “[b]ecause of the continuing nature of the overt acts alleged, the statutes of limitations do not commence to run when the contracts were executed but when they terminate.” *Id.* at 1200.[FN6]

FN6. Plaintiffs also refer the court to the decision in *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982), as offering another example of the continuing wrong rationale. However, we view this case in a different light than the decisions outlined in the text. The statute of limitations involved in *Havens Realty* dictated that a claim be brought within 180 days of a discriminatory “practice”. *See id.* at 380 n. 22, 102 S.Ct. at 1125 n. 22. The term “practice” by definition contemplates a course of action whose accrual point is not fixed at a single point in time but rather over a period of time. In essence then, *Havens Realty* is a situation where authority to adopt a continuing claim theory is specified in statute.

Plaintiffs in the instant case urge the court to apply a continuing wrong rationale to their regeneration and stumpage claims. The Government's failure to replant, they contend, constitutes a continuing wrong because the Government had an ongoing duty to ensure adequate regeneration. The wrong continued, and consequently the statute of limitations did not start running, until the BIA began a planting program. On many allotments this planting did not occur until a date within the limitations period, and hence the continuing wrong theory would keep those regeneration claims alive. Similarly, plaintiffs argue that their stumpage claim constitutes a continuing wrong, if one treats the allottees as a “unitized group”. With respect to both claims, plaintiffs seek damages dating back to the beginning of the series of alleged wrongs.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[7] Having considered plaintiffs' arguments and supporting cases at length, the court is not persuaded that the continuing wrong approach has a place in this litigation. To start with, there is a conceptual problem with characterizing the BIA's alleged wrongs as "continuing" ones. In the case of most allottees, the harvesting of their timber was accomplished in three or four "bites" carried out over a number of years. Hence, from the individual allottee's perspective, the events giving rise to a stumpage claim (and to all other claims associated therewith, including regeneration) cannot be said to involve subjection to an ongoing series of wrongful acts by the BIA. The injuries complained of involved discrete, time-isolated actions rather than an unbroken course of repeated acts of injury. In short, unless one views the allottees as a group, the factual predicate for a continuing wrong doctrine is questionable at best.

To surmount this initial obstacle, plaintiffs contend that the allottees should in fact be viewed collectively, as a single legal unit ("unitized") in as much as the BIA dealt with them in this manner in all its timber dealings. Even accepting this "unitization" approach for the sake of argument, however, the court still finds itself unable to endorse the continuing wrong theory in the present situation. It is one thing to toll the statute of limitations where each incident of an ongoing wrong is too insignificant to be recognized as a source of injury in its own right; it is quite another matter, however, to toll the statute even when a plaintiff has clear notice of the injurious nature of the defendant's acts. The latter rationale is at odds with the fundamental tenet of every statute of limitations: that one who suffers injury seek relief within a reasonable period of acquiring notice of that injury. In this court's view, the continuing wrong cases exhibit no policy considerations sufficient to overcome the basic tenet that notice of injury demands timely action.

The continuing wrong cases offer at least two rationales for the view that it is the terminal point of a repeated wrong that marks its accrual point and not any earlier notice of it. The first appears in *Fletcher v. Union Pacific Railroad Company,* 621 ***75** F.2d 902 (8th Cir.1980), *cert. denied,*449 U.S. 1110, 101 S.Ct. 918, 66 L.Ed.2d 839 (1981), in which the court asserts that "[t]he statute of limitations may be tolled until the tortious conduct ceases, on the theory that one should not be allowed to acquire a right to continue the tortious conduct." *Id.* at 908; *see also Page,* 729 F.2d at 822 (same, quoting *Fletcher*). That is, if a cause of action is deemed to accrue once and only once at a point predating the limitations period, plaintiff's claim would be lost completely, and plaintiff would have no legal recourse against the still-continuing conduct.

Although this concern is a legitimate one, we favor a solution different from tolling the statute of limitations. In this court's view, a better approach is to view the continuing wrong as a series of actionable wrongs, and allow plaintiff to sue for those wrongs which have occurred during the limitations period. This approach would prevent the defendant from escaping all liability and hence "acquiring a right" to continue its wrongdoing, while also retaining intact the six-year statute of limitations which Congress has enacted for this court. The jurisprudence of this court endorses such an approach; it is referred to as the "continuing claim" doctrine. *See Friedman v. United States,* 159 Ct.Cl. 1, 6-8, 310 F.2d 381, 384-85 (1962), *cert. denied,*373 U.S. 932, 83 S.Ct. 1540, 10 L.Ed.2d 691 (1963). We thus consider the first rationale an inadequate basis for adopting a continuing wrong approach.

The second rationale for the continuing wrong theory is that permitting a plaintiff to defer action until the termination of a continuing wrong spares the plaintiff from having to bring successive suits. *See Taylor,* 712 F.2d at 1119; *Lockary v. Kayfetz,* 587 F.Supp. 631, 636 (N.D.Cal.1984) (purpose of the rule is to avoid multiple actions and allow plaintiffs to assess full extent of damages). The case of *United States v. Dickinson,* 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947), although not strictly speaking a continuing wrong case (it has, however, been referred to in that context), illustrates well the logic behind this rationale.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

*Dickinson* was a landowner's inverse condemnation suit against the Federal Government for the value of land which the Government caused to be flooded. The inundation of plaintiff's land had occurred in a gradual, continuous manner, and the Court held that the statute of limitations did not begin to run until the situation stabilized. *Id.* at 749, 67 S.Ct. at 1385. Thus, even though the plaintiff was aware early on of his cause of action, he was not required to take action in the form of "piecemeal" litigation. *See id.* Indeed, it would make little sense to require the plaintiff to sue one year for damages caused by one water level, only to have to return to court a year later for the damages resulting from a further increase in water level.

While the "avoid successive suits" rationale for the continuing wrong theory makes sense in a case like *Dickinson*, analysis demonstrates it to be unconvincing in other contexts. The rationale does not generalize well because *Dickinson* differs from the typical continuing wrong case in one salient respect: the flooding that occurred in *Dickinson* was part of a flood control project that contemplated a raising of the water level to a specified height according to a pre-set plan. Hence, in that instance, the commencement of a lawsuit before the final flood level had been reached would not have abated the injurious conduct. Given that premise, logic dictates that plaintiff wait and sue once instead of several times.

The result differs, however, in the more common situation in which a lawsuit would operate to halt the defendant's ongoing conduct. Either an injunction or a suit for damages would, as a practical matter, prevent a typical defendant from persevering in a continuing wrong. There is, therefore, no danger of multiple lawsuits in such circumstances, since the defendant's offending conduct will generally cease after plaintiff's first successful action. And there is no reason to allow a plaintiff to delay instituting***76** an action when he is cognizant of a wrong being repeatedly committed against him. Leaving aside the question of such behavior's rationality, we believe it impermissible as running afoul of the law's general concern for the mitigation of damages.

The court therefore finds neither rationale for the continuing wrong theory persuasive in the abstract. Moreover, the approach is no more sound when applied to the present case. Assuming that the allottees were aware of their claims in the 1950's, no sound policy reasons justify allowing them to defer suit for fifteen years. Because the court is prepared to allow the allottees to sue for those portions of the alleged wrongs which occurred between 1965 and 1971,[FN7] plaintiffs never lost their right to sue, and hence, the BIA never "acquired a right" to continue its conduct. Furthermore, a timely lawsuit establishing Government liability would undoubtedly have halted the unlawful conduct, thereby obviating any possibility of multiple lawsuits. The proffered rationales for the doctrine are simply inapplicable here, and we therefore decline to adopt the continuing wrong theory in this case.

FN7. See discussion *infra* at 77-78.

As an off-shoot to their continuing wrong theory plaintiffs raise the further contention that each of the logging contracts represented the sale of a single block of timber to be harvested over a period of years. Pursuant to this description, they go on to characterize these contracts as "indivisible" undertakings whose attendant deficiencies in performance, if any, would become actionable only upon completion of the work rather than piecemeal over the course of the work.

Plaintiffs cite *Nager Electric Co. v. United States,* 177 Ct.Cl. 234, 368 F.2d 847 (1966), for the proposition that the law's disfavor of piecemeal litigation dictates the rule that a single indivisible contract may give rise to but one cause of action: " 'as a general rule, a cause of action or a claim under a contract does not accrue piecemeal and * * * where the contract contains a provision * * * with reference to the time when the contract shall be re-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

garded as finally concluded the statute of limitation with reference to bringing suit does not begin to run until that date' ". *Id.* at 245, 368 F.2d at 855,*citing Austin Engineering Co. v. United States,* 88 Ct.Cl. 559, 564 (1939). Based upon this "indivisible contract-single claim" theory, plaintiffs contend that, so far as the Taholah and Crane Creek contracts are concerned, their claims are timely since those contracts were not concluded until after the commencement of suit in this court.

The court is not persuaded by this argument. For one thing, the Taholah and Crane Creek contracts were not truly indivisible contracts if one uses that term to mean a contract calling for a performance involving a series of successive, interrelated tasks all contributing to the achievement of a single goal undertaken for a specified consideration. *See Traiman v. Rappaport,* 41 F.2d 336, 338 (3d Cir.1930) ("[a]s a general rule a contract is entire [indivisible] when by its terms, nature and purpose, it contemplates and intends that each and all of its parts are interdependent and common to one another and to the consideration."). Rather, those contracts were a series of separate contracts between individual allottees and the logging companies carried out under the administrative umbrella of the BIA. *See United States v. Algoma Lumber Co.,* 305 U.S. 415, 59 S.Ct. 267, 83 L.Ed. 260 (1939). The cutting of timber required the individual allottee's consent (expressed in the form of a power of attorney granted the BIA), the pricing of the timber was adjusted periodically, and the payments under the contracts were distributed only to allottees whose timber had been cut. Thus, while performance of the contracts was to be carried out over a period of years, the cutting, pricing and payment schemes identified the nature of the work as simply a series of independent, individually oriented tasks.

***77** [8] But even if one were to be persuaded to view each of the logging contracts as a single, comprehensive undertaking, say, because the allottees were paid on the basis of average unit-wide timber grades, that alone would not justify a rule permitting postponement of all litigation until the contracts were finally completed. It is to be remembered that the same concerns for judicial economy that prompt a rule against piecemeal litigation in the first instance also counsel against endorsing a position that would invite inefficiencies of even greater magnitude by allowing litigation to be postponed for what here would amount to decades. We can see no reason why a dispute arising under the logging contracts should not be aired within the prescribed statutory period as measured from the time the dispute first arose. That is to say, these logging contracts do not present, as did the construction claims considered in *Nager,* the unique problem of defining a common accrual point between contract claims some of which were subject to a mandatory administrative remedy and others not. Thus, there are no reasons of efficiency present here which argue in favor of postponement of suit until contract completion.

(C)

Having declined to adopt plaintiffs' tolling theories, the court now turns to an elaboration of the principles it deems applicable in this case. We begin with the premise that the statute was not tolled with respect to any claims; hence, any causes of action accruing prior to 1965 are time-barred. As indicated earlier, however, we do not view plaintiffs' claims as arising once and only once, resulting in a total elimination of their opportunity for recovery here. Rather, as discussed below, we consider plaintiffs' causes of action to be a series of individual claims, those of which accrued after 1965 being timely.

[9] Plaintiffs' stumpage claims stem from their allegations that the BIA sold their timber at inadequate prices. In the court's view, each such sale of a portion of timber generated a new and separate cause of action. Hence, plaintiffs may attempt to recover damages resulting from any timber sales in the six-year period before the filing of suit.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Plaintiffs' regeneration claims ensue from their allegations that the BIA failed to artificially restock those portions of the allotments which had been cut or burned over. This failure to replant, contend plaintiffs, breached the BIA's duty to ensure adequate regeneration in those instances in which accepted forestry practice would have required artificial restocking. Moreover, plaintiffs have asserted that accepted forestry practice after 1957 was to artificially restock, which suggests that a duty to replant necessarily arose after every cutting since then.

[10] As with the stumpage claim, the court views each such harvesting of trees as generating a new cause of action. A duty to replant each stand arguably arose after its harvest and each failure to fulfill that duty gave rise to a separate claim. The court clarifies, however, that each such claim arose only once, at that point in time after the harvest when accepted forestry standards would dictate replanting.[FN8] A plaintiff would then have six years to file suit from the time the duty to replant arose respecting his harvested timber. Thus, in the present case plaintiffs may seek recovery with respect to those stands on which a duty to replant first arose after October 18, 1965. Where a duty arose prior to that date, the claim is time-barred.

FN8. As noted, plaintiffs contend that by the 1960's a duty to replant automatically arose after each harvest. This is a factual issue, and both parties will have the opportunity to present evidence on accepted forestry practice to determine when, if at all, a duty to replant arose with respect to each stand.

III.

Consistent with the foregoing, the statute of limitations bars all of plaintiffs' claims that accrued before October 18, 1965. The Government's motion for partial ***78** summary judgment is therefore GRANTED.

Cl.Ct.,1986.
Mitchell v. U.S.
10 Cl.Ct. 63

END OF DOCUMENT